163 N.J. Super. 463 (1978)
395 A.2d 222
THE MALAKER CORPORATION STOCKHOLDERS PROTECTIVE COMMITTEE ET AL., PLAINTIFFS-APPELLANTS AND CROSS-RESPONDENTS,
v.
FIRST JERSEY NATIONAL BANK ET AL., DEFENDANTS-RESPONDENTS AND CROSS-APPELLANTS, AND ALBERT MULLER, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued September 11, 1978.
Decided November 9, 1978.
*467 Before Judges FRITZ, BISCHOFF and MORGAN.
Mr. Michael J. Mitzner argued the cause for plaintiffs-appellants (Mr. Edward Gary Reisdorf and Messrs. Mitzner & Kaczorowski, attorneys; Mr. Edward Gary Reisdorf on the brief).
Mr. Paul M. Hanlon argued the cause for respondents First Jersey National Bank, Thomas Stanton and Merton Corn (Messrs. Schumann, Hession, Kennelly & Dorment, attorneys; Messrs. James Dorment, Jr. and Louis E. Della Torre, Jr., of counsel).
Mr. William P. Taub argued the cause for respondent Dr. Albert Muller.
*468 The opinion of the court was delivered by MORGAN, J.A.D.
At issue in this interlocutory appeal is the propriety of the trial court action in entering a judgment n.o.v. with respect to two of plaintiffs' claims and of an order setting aside the jury verdicts with respect to the other claims and ordering a new trial as to them. Pursuant to leave granted, plaintiffs appeal all of these rulings; defendants cross-appeal those aspects of the trial court action granting plaintiffs a new trial, contending that a judgment n.o.v. should have been entered as to all of plaintiffs' claims. The challenged rulings following rendition of the verdicts as to liability are interlocutory; the damage aspect of the case was never tried.
At the core of the controversy between the parties is an alleged oral agreement by First Jersey National Bank (bank), a defendant herein, to make available to the Malaker Corporation (corporation), not a party, a line of credit in the amount of $2,000,000 for working capital purposes. Plaintiffs The Malaker Corporation Stockholders Protective Committee and several individual stockholders, including Stephen F. Malaker, Jerome B. Malaker and Romayne Malaker, alleged that the bank made this oral commitment. The bank denies this obligation, contending that its only "agreement" is described in a critical letter of February 3, 1969 which limits the purposes of the line of credit to government contracts and corporate acquisitions made subject to advance approval by the bank. The bank's later refusals to make certain loans were alleged by plaintiffs and found by the jury to constitute breaches of this underlying obligation. From this factual predicate spring most of the several theories upon which recovery is sought, among them breach of contract, unlawful interference with prospective economic advantage and conspiracy, all of which will be more specifically described in the following portions of this opinion. The trial took place over 25 consecutive days generating a transcript of well over 3500 pages. Because of the sheer volume of the testimony and documentary evidence, the *469 factual context of each of the separate theories of recovery will be described in connection with our consideration of its legal propriety.

Breach of alleged oral agreement to extend an unrestricted $2,000,000 line of credit.
In the fall of 1968 Stephen Malaker, president of the corporation, met defendant Thomas Stanton, then president of First Jersey National Bank, at a social function. Malaker mentioned to Stanton that the corporation "was in the process of going public" and would be needing a bank to finance its development. Following up on this initial conversation in January 1969, Stanton and Malaker carried on discussions concerning the nature of the proposed relationship between the bank and the corporation, during which Malaker advised Stanton of his need for a "$2,000,000 line of credit." During a subsequent conversation at the offices of the bank between Malaker, Stanton and the bank's loan officer, Merton Corn, the matter received further exploration. According to Malaker an oral contract was consummated at that time. Since documentary evidence of this alleged agreement is absent and no other person from the corporation witnessed the alleged handshake, its existence depends on Malaker's testimony, and it becomes essential to quote his description of the existence and scope of the alleged agreement.
* * * I told him that I wanted a two million dollar line of credit that I could pull down on as I required without going through a big hassle and he indicated that he would want our account including the proceeds of the imminent public issue deposited in his bank and that we would use the registrar and agency services of his bank and I indicated that I was willing to do that and he indicated that I had a two million dollar line of credit and we shook hands on it.
Malaker understood that no further documentation would be needed to confirm the contract. Malaker testified that in *470 reliance upon this handshake agreement he dropped negotiations with other banks and began planning corporate operations on the assumption that the unrestricted line of credit would be honored.
By letter dated February 3, 1969 the bank wrote a letter to Malaker in apparent confirmation of the prior agreement. Again, because of the critical role played by this letter, we quote it in full:
Dear Dr. Malaker:
As we discussed earlier we will be happy to make available $2,000,000 in loans to Malaker Corporation on the following basis:
For acquisition purposes:
Prospective acquisitions are subject to our review with the understanding that we will not unreasonably withhold approval. A typically acceptable purchase would involve acquisition for all stock or cash not in excess of book value plus stock. Naturally, both the financial condition of the company being acquired and the number of acquisitions made within a given period are relevant factors.
For financing of Government contracts:
Such loans will be secured by the applicable Government contract and the receivables created thereunder. It is proposed that Malaker Corporation maintain its financial position so that after granting of such loans total debt will be less than twice the tangible net worth of the company.
This is, of course, a broad outline within which we hope to work with you over the near term. As the needs of your company become more clear, modifications should be made.
Clearly, this letter does not describe the unrestricted line of credit about which Malaker testified. According to the express terms of the letter, the credit to be extended was limited to two purposes, corporate acquisitions and government contracts. Further, loans for acquisitions were to be subject to the bank's approval not to be unreasonably withheld, and as for government contracts, loans therefor would be made available so long as, with the monies advanced, "total debt will be less than twice the tangible net worth of the company." Hence, in addition to requiring the corporation to "maintain its financial position," the standards for *471 evaluating its financial soundness were specified; loans on government contracts were conditioned on such a showing.
Malaker recognized immediately that this letter failed to reflect his impressions of the oral commitment the bank allegedly made only days before because he testified that he called Stanton on receipt and asked "is this all I'm going to get?" Stanton responded (according to Malaker) that the limited commitment was all that was necessary at the time and assured Malaker that he had a $2,000,000 line of credit. Stanton denied receiving any such phone call and, of course, denied assuring Malaker of any unrestricted line of credit in any amount. Stanton's understanding of the February 3, 1969 letter was that it memorialized the bank's intention to make available $2,000,000 to be used in connection with acquisitions and financing of government contracts. An unrestricted line of credit for general corporate purposes was not contemplated because of the corporation's lack of a "track record" and its prior Chapter XI reorganization of which the bank had knowledge.
Merton Corn, the bank's loan officer who drafted the letter of February 3, 1969, also denied that an unrestricted line of credit was intended thereby. It was his understanding, as he explained it, to afford the corporation a line of credit whenever, because of uncollected receivables evidencing a healthy business outlook, cash became in short supply. In those circumstances the bank would aid in any proposed corporate acquisition or the funding of government contracts.
The foregoing represents the only direct evidence of either the restricted or open line of credit commitment in the amount of $2,000,000. Hence, the existence of the open line of credit rests essentially on the word of Malaker both as to the original oral agreement and Stanton's reassurance after Malaker's receipt of the letter. The restricted credit line is evidenced by the letter itself and the testimony of Stanton and Corn. Both parties refer, however, to facts which they contend provide the basis for inferring conclusions favorable to their respective positions. For example, plaintiffs *472 point to a letter written to Malaker on April 22, 1969 by Merton Corn wherein he told Malaker that "As soon as you indicate a need, I will be happy to ship out a supply of notes." Plaintiffs contend that such an offer is consistent with their position that the line of credit established was unrestricted since bare notes do not normally provide the means of financing corporate acquisitions or financing government contracts. Defendants, on the other hand, point out the absence of any further documentation or conversation with anyone concerning the open line of credit and the absence of all reference to such a commitment during a multitude of phone calls which were taped by Malaker.
In any event, the bank did lend substantial monies to the Malaker Corporation at various times during the 1970-71 period of the Malaker-bank relationship. Repayment was not made and the bank subsequently obtained judgments in a prior suit in the amount of the debt. Plaintiffs' allegations of breach of the underlying open line of credit established in January-February 1969 and of certain independent promises to lend money were based on those occasions on which the bank refused a requested loan. Those incidents of breach of contract, which the jury found to have rested exclusively upon plaintiffs' allegations of the open line of credit, will hereinafter be dealt with together since the existence of a breach depends upon the enforceability of the obligation to extend credit.
On defendant's post-trial motions the trial judge, however, entered judgment n.o.v. on the open line of credit issue, holding that the agreement the jury found to have been created lacked too many essential terms to be susceptible of enforcement. Although the total amount of the obligation was clear, the failure to specify rates of interest, terms of repayment, necessity for collateral or the extent thereof required, or the very duration of the agreement, rendered it too vague for enforcement. All claims based exclusively upon the enforceability of the open line of credit  that is, those *473 rejected loans unrelated to acquisitions of government contracts or not otherwise found supportable by way of promissory estoppel  were accordingly rejected.
The foregoing factual recital as it bears on this issue supports the trial judge's characterization of the evidence germane thereto as "minimal and marginal." The existence of this agreement rests exclusively on the testimony of Malaker, a person directly interested in the resolution of this issue. Even his testimony is deficient in that it does not specifically attest to a line of credit for any particular purpose; he did not testify that Stanton promised credit in the agreed amount for general corporation purposes but only that he "had a two million dollar line of credit," a fact upon which there was no real disagreement. Any force to Malaker's testimony is, in our view, dissipated by the letter of February 3, 1969 which followed within days of the handshake which allegedly sealed the agreement for the open credit line. That letter clearly limited the purposes for which the credit could be used. Again, the telephoned reassurance of the open, as distinguished from the limited, credit line rested on the testimony of the same witness. Noteworthy is the fact that no direct documentation of the open line could be found in either the bank's or plaintiffs' records, or the taped telephone conversations of which there were many, a lack particularly significant in light of the magnitude of this alleged undertaking. Even after the bank allegedly breached this undertaking no documented complaints of the breach were produced.
We need not, however, determine whether the issue was properly submitted to the jury on this state of the proofs because we agree with the trial judge that even with the jury determination that the open credit line had been promised as testified to by Malaker, the undertaking was unenforceable, as a matter of law, for lack of specificity in its terms Absent any suggestion as to what rate of interest the loan would bear, what were to be the terms of repayment of such loans, whether they were to be repaid on demand *474 or were to be given on time notes, whether they would be collateralized and, if so, what collateral could have been demanded, how long the bank was to be obligated to honor this commitment, no trier of fact could determine, without sheer speculation, whether the bank complied or breached this undertaking
An agreement so deficient in the specification of its essential terms that the performance by each party cannot be ascertained with reasonable certainty is not a contract, and clearly is not an enforceable one. Friedman v. Tappan Development Corp., 22 N.J. 523, 531 (1956). A contract so vague in the description of the performance of each party thereto is incapable of remedy at law or in equity. Caullett v. Stanley Stilwell & Sons, Inc., 67 N.J. Super. 111, 115 (App. Div. 1961). An essential characteristic of an enforceable contract is that its obligations be specifically described in order to enable a court or a trier of fact to ascertain what it was the promissor undertook to do. Williston, Contracts (Jaeger, 3 ed. 1957), § 24. See also, Heim v. Shore, 56 N.J. Super. 62, 73 (App. Div. 1959); Montclair Distributing Co. v. Arnold Bakers, Inc., 1 N.J. Super. 568, 575 (Ch. Div. 1948).
Reference to decisional authority for aid in determining the extent to which a given amount of vagueness or the absence of important terms of an agreement will be tolerable, is unavailing. Each case, being unique, turns on its facts. Hence, each of the cases cited by plaintiffs to support their contention that courts frequently tolerate considerable vagueness in the description of performances owed in an agreement is clearly distinguishable on its facts. Thus, in Stern v. Premier Shirt Corp., 260 N.Y. 201, 183 N.E. 363, 364 (Ct. App. 1932), the contract involved was an agreement to lend an amount of money sufficient to finance a certain business. The specific amount of the loan was otherwise unspecified and it was contended that this omission was fatal to enforcement. The court, however, enforced the contract, noting that this omission was the only point of uncertainty *475 in the agreement; that undertaking could be implied from the facts surrounding the promise, specifically from the fact that the defendants "were familiar with the financial requirements of the business and knew well what would be sufficient to carry it on." In the present case, the amount was subject to no dispute whatever; indeed, that was the only point of certainty in the entire agreement, assuming that there was such an agreement. All of the other terms normal to an obligation of this magnitude were missing. The other cases referred to by plaintiffs for the same proposition are similarly distinguishable on their facts. See Morgan v. Young, 203 S.W.2d 837 (Tex. Civ. App. 1947); Merchants' Bank of Canada v. Sims, 122 Wash. 106, 209 P. 1113 (Sup. Ct. 1922). Our canvass of the available authority convinces us of the correctness of the trial judge's appraisal that the clear weight of authority would hold the alleged agreement for an open credit line to be too vague to be amenable to enforcement. Accordingly, we affirm the order directing entry of a judgment n.o.v. with respect to this issue. This holding eliminates those claims of breach of contract dependent solely upon the existence and the enforceability of this open line of credit, specifically, the bank's rejection of loans in August 1970, on October 5, 1970, in April 1971, in June 1971 and in July 1971. We have identified these loans by reference to the special verdict of the jury in which they identified those rejected loans which constituted breach of the open credit line obligation.

Restricted line of credit in the letter of February 3, 1969.
This issue arises from the letter of February 3, 1969 in which the bank did offer a $2,000,000 line of credit for purposes of financing corporate acquisitions and government contracts. The trial judge denied the bank's motion for entry of judgment n.o.v. with respect to this issue, concluding that although, as in the oral agreement, essential terms were missing, enough was there to permit its enforcement. We disagree. *476 In our view, the same infirmities apparent in the agreement for an unrestricted line of credit taint this agreement as well. Its duration, the rate of interest, or other compensation to be exacted for loans made pursuant to it, the bank's entitlement to collateral and its amount, the form of the loans to be made (time or demand), the terms of repayment are all missing. The only difference between the oral and the written agreement is that in the latter the purposes of the loans are spelled out, some of the terms and some standard for measuring the sufficiency of the performance are described. We do not regard such terms as sufficient to permit enforcement. For example, the first and only alleged breach of the restricted credit line, that is, the one contained in the letter of February 3, 1969, concerned a proposed corporate acquisition about which discussion commenced with the bank in December 1969, some ten months after the commitment was given. During that month defendant Corn had discussions with William Seeds, an officer of Malaker Corporation, concerning a proposed acquisition of a company known as Vibration Eliminator for which a loan in the amount of $600,000 was requested. Corn indicated an interest in making the loan subject to the receipt and review of certain financial information. A condition to the proposed loan was to be, however, a "kicker" or "sweetener" in the form of warrants for 30,000 shares of Malaker Corporation, a demand which Stephen Malaker deemed unreasonable. Although Corn testified he told Malaker that the number of shares was negotiable, a fact Malaker denied, further financial information concerning the acquisition was not furnished and a final decision on the loan was therefore not reached.
Nothing in the letter agreement of February 3, 1969, however, even remotely suggests whether the bank's demand of such compensation was in compliance with or in breach of that agreement. Although plaintiffs concede that some collateral was probably required under this restricted credit obligation, even though no such obligation was mentioned, *477 nothing in the agreement specified what was to be paid for the loan in the form of interest or commission. No jury could, therefore, determine whether the bank's refusal to lend except on the payment of the compensation demanded constituted a breach of the February 3, 1969 undertaking.
We are convinced by the voluminous testimony in the cause that neither of these two purported "agreements," the oral or the written one, was ever intended to create a binding obligation on the bank to lend $2,000,000, irrespective of what the financial condition of the borrower would turn out to be when recourse was made to the bank's obligation to lend. The bank was fully aware that only three years before it extended this line of credit plaintiff corporation had undergone Chapter XI reorganization. Its plans for financial success, optimistic as they were, looked to the future. There is no question but that the bank intended by its letter of February 3, 1969 to establish some relationship with the corporation whereby it would enter into loans for acquisitions and government contracts if such appeared feasible when application was made for a loan. It is extremely doubtful that such a letter, or the alleged oral understanding, constituted a binding obligation to lend $2,000,000 over an indefinite period, no matter how precarious the corporation's finances might be in the future. The total absence of essential terms to the agreement bespeaks the interlocutory and tentative nature of the understanding. In the words of the letter itself, the agreement was "of course, a broad outline within which we hope to work with you over the near term * * *," and nothing more.
The letter which accompanied the letter of February 3, 1969, and which bore the same date, confirms this view. It said:
Dear Steve:
The enclosed letter I think covers the points we made in our meeting at the bank. As Mert and I mentioned, it is somewhat difficult at this point to frame your needs intelligently, but we *478 think this letter represents a good starting point.
We hope that you agree with this approach, but we would, at any rate, be happy to discuss changes.
Clearly, the bank was sketching in the broad outlines of a relationship with the corporation, with modifications being contemplated when required by future events. We cannot conceive that any bank would intend a binding commitment to lend $2,000,000 into the indefinite future to a borrower who may, in the future, turn out to be incapable of repayment, without specifying terms of repayment, or security to be posted for the amounts loaned, particularly where, in this case, the bank knew of the corporation's reorganization in 1966 wherein another bank lost substantial sums of money.
We, therefore, conclude that the trial judge erred in denying entry of a judgment n.o.v. as to all claims based exclusively on the existence of the obligation, if it can be termed such, described in the letter of February 3, 1969.

Enforcement of the promise of October 22, 1970 to lend $150,000 for January, February and March 1971.
We deal separately with this claim because plaintiffs' success with the jury rested on two legal theories: one, that the bank's refusal to lend a promised $150,000 over January, February and March 1971 constituted a breach not only of that express promise but also of the open credit line; and two, that it also was enforceable despite absence of consideration therefor, apart from the promised credit, by way of promissory estoppel. We have already held that the claim must fall insofar as it is grounded on the enforceability of the bank's open credit line obligation. We must, nevertheless, consider whether it is enforceable, or whether a jury could have properly so found, by way of estopping the bank from asserting lack of consideration as a defense. For purposes of this section, we assume that the bank's promise to lend extended to the months of January, February and March 1971, since the jury obviously so found as a fact.
*479 Much has already been written concerning the nature of and requirements for the application of the doctrine of promissory estoppel and we will not further burden this opinion with materials that can be found elsewhere. See Friedman v. Tappan Development Corp., 22 N.J. 523 (1956); E.A. Coronis Assocs. v. M. Gordon Constr. Co., 90 N.J. Super. 69, 74-80 (App. Div. 1966); Swisscraft Novelty Co. v. Alad Realty Corp., 113 N.J. Super. 416 (App. Div. 1971). Suffice it to say that given an appropriate case, the doctrine will be enforced.
The bank, however, questions the propriety of its invocation on the proofs adduced relating to this issue. Four separate factual elements must be proved prima facie to justify application of the doctrine. They are: (1) a clear and definite promise by the promisor; (2) the promise must be made with the expectation that the promisee will rely thereon; (3) the promisee must in fact reasonably rely on the promise, and (4) detriment of a definite and substantial nature must be incurred in reliance on the promise. See E. A Coronis Assocs. v. M. Gordon Constr. Co., supra 90 N.J. Super. at 74-79.
The factual predicate for this theory of recovery was an alleged promise by the bank made orally during Malaker's meeting with Corn and Mayham, another of the bank's officers, at the plant on October 22, 1970. The alleged agreement for the loan of $150,000 during January, February and March 1971 was admittedly unsupported by any consideration; hence, the reliance upon promissory estoppel as the sole means of enforcing it.
Our canvass of this considerable record, however, fails to disclose the "clear and definite promise," the sine qua non for applicability of this theory of recovery. Malaker's testimony, the sole source for this alleged promise, fails to describe a promise of sufficient definition. His account thereof, repeated several times during the course of his testimony, was to the effect that he told Corn of the corporation's need in *480 November and December 1970, of at least $100,000 a month. "He [Corn] told me to get $50,000 a month out of our accounts payable; that is, not to pay our vendors, and that he would give us $50,000 a month in November and December of 1970, and that if we needed additional funds after January 1, 1971, he would require additional collateral * * *." No specific amount for 1971 was promised; the only testimony concerning $50,000 a month for January, February and March 1971 was Malaker's account of the corporation's need for money during that period. Malaker testified:
We didn't discuss total amount, we discussed rates. I told them we would need at least $50,000 a month until we completed our rights offering, which would have been, taking the 90 days it normally takes to go through the SEC, would have been March or April.
The promised $100,000 for November and December 1970 was loaned; at issue, under this theory of recovery, was the bank's refusal to lend $150,000 during January, February and March 1971. The record, so far as we could discern, is, however, devoid of a promise to make a loan in that amount. At best, one could imply a promise of a loan of some indefinite amount guaranteed by additional collateral. We do not regard this kind of implied undertaking to lend an unspecified amount of money as the "clear and definite promise" that is required as an adequate foundation for estopping the bank to deny absence of consideration as a defense. This is particularly true in light of the undisputed fact that the bank did lend the corporation $10,000 to cover immediate payroll needs, during January 1971 and on an unsecured basis. Hence, in our view, the first essential element of a promissory estoppel was not evidentially established in the record to the level necessary to permit jury consideration thereof.
With respect to the second requirement, that the bank anticipate that the corporation would rely on the promised loan, it would be the rare lender who would not expect that *481 a promise of needed money would induce the borrower to cease looking elsewhere for it. In the normal case, one promising the loan of money would be found necessarily to have anticipated that kind of reliance. In this case, however, an additional factor is present. The bank knew that in connection with a prior loan, collateralized by the corporation's accounts receivable and inventory, the corporation had expressly agreed not to seek financing elsewhere without the bank's consent.[1] Hence, under these peculiar facts the bank could not have anticipated that the corporation would rely on the promised loan by not seeking financing elsewhere because, pursuant to the prior agreement, it knew the corporation was foreclosed by this agreement from doing so. That the agreement, foreclosing recourse to other money sources, could be held unenforceable, as plaintiffs now suggest, was not shown as being within the bank's knowledge. All that the bank knew at the time was that it was the prior agreement, not the promise of the requested money, which foreclosed the corporation from seeking financing from other sources.
The last two required elements of promissory estoppel can best be considered together. What these two requirements demand is a showing of detrimental reliance of a substantial nature by the promisee, the corporation. Here, again, plaintiffs' proofs fail. First, according to Malaker's own testimony, recourse was, in fact, made to other sources of *482 financing once he was advised that the loan of $50,000 for January 1971 would not be made. On his direct testimony he stated that after rejection of the requested loan for January "I contacted other capital sources." In addition, he dipped into his personal estate and obtained loans from relatives. It was from these noninstitutional sources that funds were derived which kept the corporation alive through those difficult months. More importantly, there is not the slightest suggestion in the record, from Malaker or others, that any money from these other "capital sources" was forthcoming. No proof was adduced that in the absence of the alleged promise of October 22, 1970 the corporation could have raised the needed money elsewhere. All indications are to the contrary.[2] Despite the fact that Malaker knew that the bank was not going to lend the requested $150,000 in the early part of January 1971, no other institutional source of funding was uncovered during the ensuing months before the next loan was made by the bank in April 1971. Moreover, this was not the bank's first rejection of Malaker's request for loans, and on none of the prior occasions did Malaker uncover alternative sources of funding. In short, the claimed detrimental reliance, the forebearance from seeking other sources of funding in reliance on the bank's voluntary promise to supply such funds, was not of the substantial nature required by the doctrine of promissory estoppel. The only conclusion to be derived from the record, including the fact that its most valuable assets, its inventory and accounts receivable had already been pledged as collateral for a prior loan, is that the right of opportunity to seek capital elsewhere, allegedly not exercised in reliance on the bank's promise, was of little value because had it *483 been exercised, it would not have proved fruitful. We do not regard the nonexercise of such a right or opportunity as having the substantial value required for the protection of promissory estoppel.
Plaintiffs argue that a search for funding, had it been made, would have been successful and that the record so shows, at least to the extent that jury consideration thereof would have been justified. They point to the fact that only a few months after the rejection in January 1971 defendant bank itself lent plaintiffs money during the periods between April and October in an amount well in excess of the loan rejected in January, as evidence that others as well would probably have lent it money. It is true that in April 1971 defendant bank did lend plaintiffs $90,000 and that during the months of July, August, September and October 1971 an additional sum of $135,000 was advanced. Hence, plaintiffs argue that if defendant bank lent money considerably in excess of the $150,000 loan rejected in January 1971, others would have done so had plaintiffs not been lulled into a sense of security by the bank's promise. The argument, although having some appeal, is not borne out by the record. It must be remembered that defendant bank was not just any lender considering a new loan to a new borrower. Rather the bank was a creditor of the borrower to the extent of $260,000 at the time the loans commencing in April 1971 were made, with little prospect of being repaid. The $90,000 loan in April 1971 was made on the express representation of Namad, one of the corporation's financial advisers, that the corporation was about to complete an equity offering. The bank viewed this prospect as a means of securing repayment of the past due indebtedness. The final loan of $135,000 in July 1971 came only after the bank had first demanded payment in full of all indebtedness, but was then persuaded by the corporation's attorney that it would be wiser for the bank to go one more step in an attempt to turn the corporation around and thus secure repayment of all loans. Obviously, the bank had concerns *484 different from those which would persuade a new lender to make a new loan to a new borrower, and more particularly one already in default on other obligations and one whose principal assets were already pledged as collateral for those unpaid loans. Hence, we cannot view defendant bank's subsequent loans as any evidence that the corporation would have been successful in obtaining alternate funding had it looked for it, at least in the total absence of any evidence of the mere possibility of success.
The essential justification for the doctrine of promissory estoppel is the avoidance of substantial hardship or injustice were the promise not to be enforced. Too liberal an application of the concept will result in an unwitting and unintended undermining of the traditional rule requiring consideration for a contract. This is particularly true where the promise is the loan of money. Such promises, even when unsupported by consideration, do induce borrowers to neglect to secure the needed money elsewhere, and lenders must be held to anticipate such conduct. To hold as enforceable, however, a voluntary promise of a loan made to one who, in reliance thereon, fails to exercise a valueless right to seek the money elsewhere, would be tantamount to rendering all such voluntary promises of a loan enforceable without consideration. A determination declaring such a deviation from presently accepted contract principles should only come from a confrontation with that issue, and not as an unintended consequence of the loose application of promissory estoppel to promises to lend money.
We are satisfied that none of the essential elements of promissory estoppel were evidentially established to a point warranting jury consideration. No express promise of a "clear and definite" nature was made, even according to plaintiffs' account of the transaction, and no detrimental reliance of a substantial nature was shown. In this evidential context the issue should not have been submitted to the jury, and the trial judge should, therefore, have granted defendant's motion for judgment n.o.v.

*485 The Block-Honeywell-NASA transaction of December 1971.

There is no question but that with respect to this transaction, as we understand it, the bank voluntarily assumed a role of the agency by which funds needed by the corporation to execute a purchase order from Block-Honeywell, who itself was working on contract for NASA, would be protected from the claims of the corporation's creditors. These funds were intended for use by the corporation in execution of the purchase order. By December of 1971 the corporation had no funds with which to complete the requirements of this purchase order. Funds had to be supplied by NASA through Block-Honeywell, the party with which the corporation contracted. Had funds been deposited to the corporation's own account, they would have been subject to the demands of the corporation's creditors, including the bank. As an accommodation, the bank agreed to refrain from seeking satisfaction of its claims from such monies, and to protect the money provided by Block-Honeywell by setting up what has been referred to as a cash collateral account into which the monies needed by the corporation for the Block-Honeywell order would be deposited. The corporation would then draw on its own account by check for the needed monies and the bank would pay the overdrafts by cash from the cash collateral account.
It should be noted that in this transaction the bank was not acting as the corporation's lender; its money was not being placed into the cash collateral account. Hence, neither the alleged open credit line nor the more restricted written credit line obligation governed this transaction which all admit was unsupported by any consideration.
The account was set up and the corporation and the bank operated under it until the latter part of December 1971, between December 23 and December 27, 1971, when the bank first threatened and later did reject its role as intermediary for this contract, closed out the account and *486 refused to honor the corporation's overdrafts on its account. The money in the account was subsequently returned to Block-Honeywell.
The reason for this action by the bank is found in events connected with a prior loan to the corporation. During June through September 1971 the bank lent to the corporation the sum of $135,000, a condition of which loan was the execution by the corporation of an assignment of its remaining intangible assets, including its patents. Evidence of this condition can be found in reports of meetings as early as July 1971. The assignment was drafted by the bank and sent to the corporation's counsel, who successfully obtained certain changes therein. The negotiations, however, continued over a substantial period of time, during which the bank turned over the promised funds. When the bank's officers finally realized that the total amount of the loan had been made without the required assignment having been executed, they asked for its immediate execution. When execution was refused, the bank's president threatened the action which was finally taken, and when thereafter no signed assignment was presented, closed out the cash collateral account and rejected the role it had voluntarily agreed to assume. It was and is the bank's position that the action of the corporation's principals was in bad faith in that they accepted the proceeds of the loan knowing that the assignment which was to secure its repayment had not been executed and that after receiving the loan they refused to honor the underlying agreement to execute it, and that the bank was fully justified in terminating the later Block-Honeywell arrangement into which they entered simply as an accommodation to this faithless debtor.
The bank's liability for its actions in connection with the NASA-Block-Honeywell transaction was also submitted to the jury on the basis of promissory estoppel, the trial judge charging that "as a matter of law * * * Malaker furnished no consideration for the Bank's promises." The positions of both the corporation and the bank were outlined *487 to the jury in the following terms. As to the corporation the judge charged:
In other words, Malaker says that the Bank should be foreclosed from denying the enforceability of its promise, should be estopped from denying the enforceability of its promise. Malaker says that it reasonably and foreseeably relied on the Bank's promise to go along with the NASA-Block-Honeywell arrangement; that as a result it entered into agreements with Block-Honeywell, it rehired personnel, ordered materials, and issued checks, all in reliance on these promises and all, it says, to its substantial economic detriment. * * *
As to the bank the judge charged:
In response the Bank says that Malaker, having been essentially closed down before December 1st, could not substantially change its position to its detriment, when as a result of the Bank's refusal to transfer moneys, it closed down again in December 1971 or January 1972.
The trial judge further explained the bank's position with respect to plaintiffs' failure to execute the patent assignment and assignment of the NASA contract as permitting a finding that the bank was justified in terminating the Block-Honeywell arrangement.
The jury found for plaintiffs, concluding specially that the bank was not justified in breaking its promise with respect to its role in this transaction.[3]
On appeal plaintiffs urge trial judge error in ordering a new trial of this issue; the bank, on its cross-appeal, challenges the trial judges denial of its motion for *488 judgment n.o.v. Both parties rely upon the positions outlined by the trial judge in his charge to the jury.
We consider first the bank's contention that plaintiffs failed to adduce sufficient evidence of detrimental reliance on the bank's voluntary agreement to trigger application of promissory estoppel. Our examination of the record compels us to conclude that this position has substantial merit. First, it must be borne in mind that the corporation lacked the funds necessary to execute the work required by Block-Honeywell. Indeed, it was both this impoverished state and the known demands of the corporation's creditors that were the raison d'etre of the cash collateral account. Had the corporation assets been sufficient to pay creditors or to itself finance performance of the work for Block-Honeywell, the account would never have had to be established. Hence, none of the corporation's own money went into this job; Block-Honeywell's prepayment of the amount owed on the purchase order was to be used to fund the contract.
Moreover, it is not true, as plaintiffs contend, that it was in reliance on the bank's promise with respect to the collateral account that the contract with Block-Honeywell was executed. The corporation's relationship with that company went back as far as 1970, and throughout the ensuing years change orders were routinely submitted. The only purchase order received following establishment of the cash collateral account involved a specific job to be financed by a prepayment of the amount owed on the contract.
Any equipment purchased for this job had to have been paid from the funds advanced by Block-Honeywell, a conclusion compelled by the corporation's precarious financial position which was the reason for the bank's participation, at least in the absence of any hard evidence to the contrary. Conclusory testimony that personnel were hired in reliance upon the bank's voluntary undertaking is equally unpersuasive when it is realized again that all monies to finance these hirings came from Block-Honeywell, not from the corporation. Nothing in the record suggests that the corporation *489 drew on a nonexistent cash account. Moreover, no one suggests that Block-Honeywell or NASA ever sought to hold the corporation liable for its ultimate nonperformance.
Whatever we could find in this record supports the bank's contention that the corporation was in serious financial straits before the Block-Honeywell transaction and that it merely reverted to this status after the transaction came to its end. Nothing in the record supports the required showing of action on the part of the corporation of a "definite and substantial character" induced by the bank's promise. Friedman v. Tappan Development Corp., supra 22 N.J. at 538.
We recognize the difficulty, frequently not foreseen by trial judges, encountered in trials bifurcated for liability and for damages where, as here, proof of substantial damage is an essential requirement for imposition of liability. Plaintiffs might well urge, and we have therefore considered the contention, that proof of damage was withheld because of the pendency of the trial on damages. In some cases we would be persuaded to grant a new trial because proofs of damages were inadvertently withheld because thought germane only to damage, not liability issues. The record in this case, however, persuades us that no such course is appropriate. Indeed, Malaker testified that the Block-Honeywell prepayment into the cash collateral account was the necessary condition to reactivating their plant. Without this financing such bare essentials as utility services for the plant could not be furnished. Personnel had gone for substantial periods without payment. Clearly, and this from Malaker's own testimony, the corporation was virtually defunct insofar as its ability to operate was concerned, without the money infusion from Block-Honeywell, and this to the knowledge of Block-Honeywell. With this undisputed financial picture as a background we fail to find in this record any evidence as to how termination of the cash collateral account inflicted further damage on the previously inactive company. Bare allegations of reliance in the rehiring of personnel and the ordering of equipment, divorced *490 from the realistically appraised financial condition of the company, is simply an insufficient basis on which to found a claim of promissory estoppel, a form of protection devised only where "injustice can be avoided only by enforcement of the promise." Restatement, Contracts, § 90 at 110 (1932).
We, therefore, conclude that judgment n.o.v. on this issue should have been granted.

Malicious Interference.
The claims of malicious interference upon which the jury found for plaintiffs were based exclusively upon the bank's failure to honor its alleged legal obligation to lend money to a certain amount. Each alleged breach of contract was urged as the basis of tort liability for malicious interference in the plaintiffs' business for the purpose of recovering punitive in addition to compensatory damages. Our disposition of the claims for breach of contract, therefore, disposes as well of the malicious interference claims, and judgment n.o.v. should have been entered as to them.

Conspiracy.
We affirm the trial court judgment n.o.v. as to the civil conspiracy count for reasons given by the trial judge. We add only that judgment was also justified by the admitted fact that the conspiracy was an unsuccessful one. As submitted to the jury, the conspiracy consisted of a combination between the bank, some of its defendant officers, and one Albert Muller, a member of the corporation's board of directors, to oust Stephen and Jerome Malaker from their position as the corporation's principal officers for the purpose of obtaining control of the corporation's assets, liquidating them, and thereby concealing the existence of the several breaches of contract which were litigated in the present suit. The fact of the matter is, however, that the Malakers were never ousted from their positions with the corporation. Muller was never installed, and the bank never obtained, by that means, control over the corporation's assets.
*491 The gist of an action in civil conspiracy is not the conspiracy itself but the underlying wrong which, absent the conspiracy, would give a right of action. Asbury Park Bd. of Ed. v. Hoek, 38 N.J. 213, 238 (1962). The essential element of the tort is not the conspiracy but the damage inflicted pursuant to it. Where the conspiracy fails of its purpose, damage flowing therefrom would normally be absent. Indeed, it has been said civil liability cannot be imposed for an unexecuted conspiracy. Lynes v. Standard Oil Co., 300 F. 812, 817 (E.D.S.C. 1924).
Hence, in this case, although the jury found an attempt was made to inflict damage on the corporation through the described conspiracy, the attempt failed and we have been provided with no other recital of the damage suffered by plaintiffs through the means of this unsuccessful conspiracy.

Entire Controversy Doctrine.
We have deferred discussion of one of the bank's principal contentions in order that it may be considered in a developed factual context. Beyond its substantive contentions urging entry of a judgment n.o.v. as to all claims, the bank takes the position here, as it did at the trial level, that all of plaintiffs' claims are foreclosed by operation of the entire controversy doctrine. Resolution of that issue requires analysis of the extended history of the present litigation and its temporal relationship to the underlying controversies.
As is apparent from the foregoing analysis of plaintiffs' claim and the defenses thereto, all relevant facets of the commercial dealing between the parties terminated in December 1971 with the demise of the cash collateral account created to fund the Block-Honeywell transaction. The last loan to plaintiffs took place earlier, during the summer of 1971. Hence, by the time the first litigation was commenced by the bank, as plaintiff, in the Superior Court of New Jersey, Hudson County, on February 22, 1972, both parties were in full possession of all facts relating to their then terminated relationship.
*492 In its first appearance before the courts of this State, the controversy among the parties emerged as a claim by the bank, as plaintiff, for repayment of the amounts loaned the corporation.[4] In that complaint the bank alleged loans made to the corporation in exchange for promissory notes bearing interest at 8 1/2% and their nonpayment on presentation. Judgment in the amount of $482,853.34 was sought. Other counts sought to impose liability on Stephen and Romayne Malaker personally, on the basis of their alleged guarantees of the corporate notes.
In the answer to this complaint filed in August 1972[5] the corporation admitted liability to the bank on account of the loans made in the amount of $350,000, alleging, in defense, that the agreement, pursuant to which the loans were given, "states that the aggregate loans to be advanced by the plaintiff shall not exceed $350,000 and that the interest rate shall be 8%, not 8 1/2%, per annum." This theme was pursued in the "Second Separate Defense" wherein it was alleged that "The loan agreement between the plaintiff and the defendant, Malaker Corporation, provided for a maximum loan of $350,000, together with interest at the rate of 8% per annum. The corporate officer signing the Notes of Malaker Corporation * * * did not have the legal authority to incur liabilities on behalf of the corporation in excess of $350,000." In the "Third Separate Defense" the corporation and the individual defendants alleged that the notes sued upon were issued at a time when the corporation was insolvent to the bank's knowledge, a condition "deliberately concealed to the detriment of the other creditors of the corporation and to the corporation's shareholders."
*493 The First Separate Defense, really a counterclaim and specifically asserted in a counterclaim filed as part of the answer, sought damages for the bank's alleged wrongful dishonor of the corporate checks, an apparent reference to the closing of the cash collateral account on termination of the Block-Honeywell matter, and for the "timing and manner in which funds were advanced to Malaker Corporation" causing the company substantial damages. The latter allegation referring to the "timing and manner in which funds were advanced" is the only one having possible reference to the present matter.[6]
The answer was suppressed and the counterclaim dismissed on August 22, 1973 for failure of defendants in that action, the corporation and the Malakers, to answer interrogatories. Final judgment for the bank was entered on October 24, 1973 with Malaker appearing pro se.
On May 2, 1973, before entry of the final judgment in the state court action, the corporation, a committee of stockholders and the Malakers filed suit in the United States District Court against the bank, alleging as a first cause of action the bank's conspiracy with others "to obtain control of the Malaker Corporation, its assets and valuable patent rights," pursuant to which it "induced the Malaker Corporation to borrow funds from the defendant, FIRST JERSEY NATIONAL BANK, and to sign certain indenture agreements for its real estate and security agreements for its machinery and other assets, in favor of the bank, in order to secure the said loans." It was alleged that in furtherance of this conspiracy the bank "forced the plaintiffs * * * *494 into signing a security agreement" pledging shares of the corporation as security for repayment of these fraudulently induced loans. Again, it was alleged that as part of this same conspiracy, the bank "prevented the Malaker Corporation from repaying its debt by making false, slanderous and libelous statements concerning the Malaker Corporation's assets, prospects and management, thus preventing the plaintiff from obtaining funds elsewhere; intentionally interfering with the plaintiffs' business, dishonoring checks drawn upon the defendant, FIRST JERSEY NATIONAL BANK, while adequate funds were on deposit with the defendant to honor the said checks; and by various other methods, all in order to force the Malaker Corporation to default on its loan, and thus be able to foreclose upon the shares of the Malaker Corporation owned" by the Malakers. The bank was also alleged to have slandered the Malakers personally, "thus preventing them from obtaining funds elsewhere," for the same purpose of obtaining control of the corporation by forcing a default in repayment of the loans.
This elaborate allegation of conspiracy was apparently abandoned in an amended complaint. The second cause of action concerned, primarily, claims of wrongful dishonor of checks, again referring to the closing of the cash collateral account in termination of the Block-Honeywell matter. This claim was repeated in the amended complaint.
The third cause of action alleged the bank's conspiracy with the auctioneers to sell the corporation's real estate at a fraction of its real value, as a result of which the corporation was "unable to obtain the financing necessary to continue operating its business."
After interim dismissals for lack of subject matter jurisdiction, all counts in the federal action were discontinued by August 26, 1974.[7]
*495 At about the same time that the federal suit was terminating, the present action was instituted in August 1974, over 2 1/2 years after the bank initiated litigation for repayment of the loans. Repeated in this complaint was the conspiracy allegation, virtually identical to that described in the previous federal litigation. In the third cause of action asserted, however, there emerges for the first time the allegation concerning the bank's breach of an agreement to extend credit. Significantly, however, the allegation is of an agreement to "provide a two million dollar ($2,000,000) line of credit for acquisition and contract financing." (Emphasis supplied). It was not until pretrial of this matter in October 1976 that plaintiffs' allegations concerning an open line of credit, the principal issue tried, emerged.[8]
The bank contends that plaintiffs' claims asserted in this action were barred by operation of the entire controversy doctrine. Specifically, it contends that the judgment obtained by it in October 1973, adjudicating its right to repayment of loans made to the corporation and dismissing the corporate counterclaim alleging damages stemming from the wrongful dishonor of checks and damage from the "time and manner in which funds were advanced," foreclosed later assertion of *496 the claims made in the present suit. The trial judge denied dismissal of the claims on this ground for three reasons: (1) the claims were separate and independent causes of action; (2) the claims were not mandatory counterclams in the prior state litigation, and (3) additional parties defendant in this action were not necessary parties to the first action.
The content and scope of the entire controversy doctrine has received extended and recent consideration, and we will not further burden this already lengthy opinion with a repetition. Wm. Blanchard Co. v. Beach Concrete Co., Inc., 150 N.J. Super. 277 (App. Div.), certif. den. 75 N.J. 528 (1977). Suffice it to say the entire controversy doctrine requires each party to litigate all aspects of a controversy in one legal proceeding. Leisure Technology v. Klingbeil, 137 N.J. Super. 353, 357 (App. Div. 1975). Generally, a judgment disposing of one portion of a controversy will bar later litigation concerning other portions of it. Under this doctrine the "entire controversy," rather than its constituent causes of action, is the unit of litigation and joinder of all such causes of action is compulsory under penalty of forfeiture. Schnitzer, Civil Practice and Procedure, 9 Rutg. L. Rev. 307, 334 (1954). The constraint obtains even where the belatedly asserted cause of action is an independent one, in the sense of itself being separately adjudicable. Wm. Blanchard Co. v. Beach Concrete Co., Inc., supra 150 N.J. Super. at 294. A defendant must assert all matters which will defeat a claim against him, and a plaintiff must seek complete relief for vindication of the wrong he charges. Applestein v. United Board & Carton Corp., 35 N.J. 343, 356 (1961).
In Blanchard, decided after the trial court ruling on this issue, a claim in a yet pending litigation was barred, not, it is true, by application of the entire controversy doctrine, but by the trial judge's refusal to countenance a tardy amendment of the pleadings to assert it. The trial judge was, however, aware of the negative implications of his ruling to *497 the ability of the litigant to assert the claim in later independent litigation. On appeal the Appellate Division affirmed, agreeing, by dictum, that the claims that could not be asserted by amendment would, by the entire controversy doctrine, be barred from the later litigation in an independent suit.
[The entire controversy doctrine] must be applied empirically. That is to say, an evaluation must be made of each potential component of a particular controversy to determine the likely consequences of the omission of that component from the action and its reservation for litigation another day. If those consequences are likely to mean that the litigants in the action as framed will, after final judgment therein is entered, be likely to have to engage in additional litigation in order to conclusively dispose of their respective bundles of rights and liabilities which derive from a single transaction or related series of transactions, then the omitted component must be regarded as constituting an element of the minimum mandatory unit of litigation. That result must obtain whether or not that component constitutes either an independent cause of action by technical common-law definition or an independent claim which, in the abstract, is separately adjudicable. [150 N.J. Super. at 293-94]
Consequently, although we agree with the trial judge's characterization of certain of plaintiffs' claims as being separate and independent ones, capable of separate adjudication, we disagree that such characterization is dispositive of or even bears on whether the claims were barred by the prior state court judgment. The essential inquiry is whether the claims here asserted derive from a single transaction or a series of related transactions, a portion of which was disposed of by final judgment in the earlier lawsuit. If they have such derivation, they are barred.
In order to make that determination, we give full credit to the claims as plaintiffs have asserted them, and consider those claims in their relationship to the claims reduced to judgment in the prior litigation. The underlying basis of most of plaintiffs' claims was the bank's agreement, oral or written, to extend to them a $2,000,000 line of credit, *498 restricted or unrestricted. Perhaps the best support for this proposition is the jury's verdict which found each rejection of a requested loan to be a breach of this undertaking. The only possible exceptions are those claims arising out of the Block-Honeywell transaction and the alleged conspiracy; even these, however, had their genesis in the bank-corporate relationship which, according to plaintiffs, was defined by those credit extension agreements.
Juxtaposing the bank's claims in the initial 1972 suit with plaintiffs' claims asserted in this 1974 litigation, it can be seen that that which the bank asserted constituted full performance, entitling it to recover repayment of its loans, was, asserted by plaintiffs in this suit, such a deficiently rendered part performance of a larger obligation as to constitute multiple breaches thereof. Clearly, a loan of $350,000 was not performance of an agreement to lend $2,000,000. Viewed thus, the bank's earlier claims were only part of a larger controversy, litigation of which was delayed until the smaller portion was reduced to judgment. A valid defense to the bank's earlier suit would have been that the very money for which the bank sought recovery evidenced breach of the larger obligation, damages for which would either mitigate or even extinguish the corporate liability on the loan. The bank's loans were made pursuant to the same obligation which it breached by its failure to lend more. Hence, the bank's claims in the prior suit, upon which judgment was recovered, and plaintiffs' claims in the present litigation, do derive from the same transaction or series of transactions  the underlying alleged agreements to extend credit. All claims are therefore components of a single controversy, the disputed rights and liabilities of the parties under the credit extension agreement or agreements.
Moreover, plaintiffs' claims are of a liquidated nature or, at the very least, are liquidatable, and were, contrary to the trial judge's holding, embraced within the mandatory counterclaim rule. R. 4:7-1. See Schweizer v. MacPhee, 130 N.J. Super. 123 (App. Div. 1974). Plaintiffs' failure to *499 assert them in the prior action, therefore, bars their later litigation even were they considered as not arising out of the transaction which was the subject matter of the bank's earlier claim.
In its brief the corporation contends that the causes of action asserted in this matter were pleaded in its federal court suit which was commenced before, not after, judgment was entered disposing of the bank's claims on the corporation's promissory notes. Hence, it argues that the bank's claims and the corporation's claims were being asserted simultaneously, albeit in two separate actions, and that the fact that judgment in the bank's suit was first recovered should not preclude litigation of the companion suit and its later derivative, the present matter. We need not, however, decide whether recovery of judgment in one suit bars continued litigation of other related claims asserted in a companion suit because, as we view the pleadings, the essential claims plaintiffs here assert, the breach of contract and promissory estoppel claims as well as the related malicious interference claims, were not asserted in the federal court action at all. As previously noted, that suit projected claims which, although sounding in conspiracy, were almost directly contradictory to the claims litigated in this matter. Nowhere in the pleadings in the federal court suit can be found allegations as to a promised line of credit, breach of contract by a refusal to lend money, and voluntary promises enforceable by promissory estoppel. Even the conspiracy claim as here litigated differed so fundamentally in its essential contours from the conspiracy claim first asserted in the federal court suit that there can be no legitimacy to the assertion that the present claim was asserted before judgment in the bank's original suit on the notes was entered.
We do not regard this result as a harsh one. Plaintiffs were in possession of all facts necessary to their present theories of recovery long before the bank initiated the state court litigation seeking recovery of the amounts loaned. The *500 corporate-bank course of dealing under the alleged credit extension agreements terminated by the end of 1971. The existence of the alleged open and oral line of credit being evidenced only by the testimony of Stephen Malaker, the principal concerned in the later unsuccessful efforts of the corporation to obtain loans, discovery was therefore unnecessary to learn of the agreement's existence or breach thereof. If there were breaches of this agreement, Malaker knew of them, by personal involvement therein, well before any litigation commenced. Nothing was discovered after the litigation commenced relevant to the matters in the present action.
We have not been provided with an explanation of why plaintiffs tarried with their causes of action until the latter part of 1974, after disposition of the bank's state court litigation and their own federal court suit, when the facts known to them then were the same as those known in 1974, or in 1976 when breach of the open and oral credit line was first alleged. Certain it is, however, that they did not lack for legal imagination. The historical progression of their pleadings alleging wrongful dishonor of checks, slander of credit, the bank's conspiracy with others to induce plaintiffs to borrow money, and the like, bespeak a great deal of legal activity. Whether or not the present matters were intentionally withheld for tactical reasons or inadvertently omitted, the result must be the same. Plaintiffs were offered a forum in which to submit their claims; they asserted some, although not the ones which we now hold barred. Their failure to plead and litigate concerning matters then known to them in complete adjudication of a controversy in suit forecloses them from doing so now.
Those portions of the trial court order granting judgment n.o.v. are affirmed; those portions granting plaintiffs a new trial are reversed, and with respect to all issues judgment n.o.v. in defendant's favor is granted.
NOTES
[1] In June 1970, only three months before the alleged commitment of October 1970, the bank had loaned the corporation $150,000 in exchange for an executed assignment of inventory and accounts receivable and the following agreement:

Without the written consent of the bank, the borrower will not engage in any other financing or create any indebtedness for money borrowed except loans made hereunder or allow any adverse financing statement covering the borrower's inventory or any other collateral or the proceeds thereof to be on file in any public office.
The bank knew that Malaker was aware of this restriction against borrowing elsewhere because it had rejected, on August 25, 1970, Malaker's request for a waiver or modification of this restriction, as well as for a further loan of $200,000.
[2] For example, only two months prior to the alleged commitment of October 1970 the bank had refused a requested loan in the amount of $200,000. The needed money was not supplied by others. Again, in early October a request for a loan was refused, or so the jury found. No other sources of capital were uncovered.
[3] It is not entirely insignificant to a realistic evaluation of this case that the jury's verdict concerning all the claims for breach of contract and those based upon promissory estoppel which we have discussed so far was returned in little more than 2 1/2 hours, which period included their lunch and two questions to the court. Sixteen separate interrogatories were answered during this period from testimony taken during 15 trial days.
[4] The complaint also sought recovery on personal loans made; those, however, are not pertinent to the issue under consideration.
[5] Answer was delayed pursuant to agreement between the parties during several months of negotiations, unsuccessful it would seem, concerning possible long-term financing.
[6] The entire counterclaim reads as follows:

Defendants, by way of Counterclaim against the plaintiff herein, say, that by reason of the plaintiff's negligence in dishonoring checks of the defendant, Malaker Corporation, and in the timing and manner in which funds were advanced to Malaker Corporation, caused the defendants to suffer substantial injuries.
Wherefore, the defendants pray for judgment against the plaintiff for such damages as are just and proper, * * *.
[7] The dismissals read as summary judgments in favor of the bank. All parties agree, however, that the claims were voluntarily discontinued.
[8] The contradictions between the facts pleaded in the prior litigation and those pleaded in the present one are manifest. See, New Amsterdam Cas. Co. v. Popovich, 18 N.J. 218, 224 (1955). In 1972 the defendants, here plaintiffs, specifically alleged a limitation on the corporation's borrowing capacity; according to the answer in that early suit, the agreement between the bank and the corporation allowed for only $350,000 in loans, and amounts loaned in excess of that figure were alleged to be unauthorized. In the present suit the gravamen of the complaint is an agreement to lend $2,000.000, not $350,000, and the bank's failure to lend far in excess of $350,000, with no suggestion being made of the corporation's lack of authority to borrow to the larger amount. In their federal court complaint plaintiffs alleged that the bank induced them to borrow; in the present matter they alleged and sought to prove that they frantically attempted to borrow and that it was the bank that rejected their requests.