**RESPONSE ONCOLOGY, INC., f/k/a Response Technologies, Inc., Respondent,**

v.

**BLUE CROSS & BLUE SHIELD OF MISSOURI, Appellant.**

**Nos. WD 52263, WD 52292.**

Missouri Court of Appeals, Western District.

March 25, 1997.

Michael Roy Baker, Columbia, for Response Oncology, Inc.

Stephen F. Gaunt, Rolla, for Blue Cross & Blue Shield of MO.

Before LOWENSTEIN, P.J., and BRECKENRIDGE and SMART, JJ.

LOWENSTEIN, Judge.

This dispute arose between a medical treatment provider and provider of health care benefits (insurer) in the arcane world of health insurance and provider reimbursement. Before reciting all the facts, an overview is in order.

The plaintiff-respondent (Response) operates the IMPACT Center (an acronym for implementing advanced cancer treatment) in Columbia which administers high dose blood cancer treatment on an outpatient basis from a free-standing building. This treatment for blood cancers utilizes high dose chemotherapy (HDC) including peripheral stem cell transplantation (PSCT). This methodology of treatment, performed in five stages, is for persons suffering from a type of cancer known as lymphoma. The first four treatments are rendered to outpatients at the IMPACT center. The last stage requires hospitalization. The defendant-appellant, Blue Cross and Blue Shield (Blue Cross), entered into a private contract of insurance with Michael Jabbour. This contract, referred to as a managed care contract, obligates Blue Cross to pay essentially all the patient-insured's costs of treatment if provided by preferred medical providers, specifically named by Blue Cross. This contract generally prohibits the insured (patient) from assigning any contract benefits. The five-

stage HDC treatment was listed as a covered benefit to the insured under his contract with Blue Cross. In late 1992, Jabbour, a mid-Missouri resident, was diagnosed with lymphoma. His physician recommended high-dose chemotherapy (HDC) and PSCT.

Blue Cross had a separate contract with Response in which Response of Columbia would, as a provider, perform certain lower level blood treatments known as Home Infusion (HC) on persons who had a contract of insurance with Blue Cross. This contract, referred to as a participating provider contract, allowed all Blue Cross's policyholders to use the named provider for a pre-set fee. After the treatment, the health care provider would be directly reimbursed for the agreed upon amount. No bill would be sent to the patient. In November of 1992, Jabbour executed an assignment of benefits under his Blue Cross contract in favor of Response. In early January 1993, Jabbour started high dose chemotherapy treatment at the IMPACT Center. He completed the treatment, but unfortunately, he died. As the reader might now guess, the cost of treatment by Response far exceeded the amount Blue Cross felt it was obligated to pay, hence, this suit was initiated and resulted in a judgment in favor of Response for the difference between Response's reimbursement from Blue Cross and the actual cost of the treatment provided to the patient.

In the elaboration of the contracts and their provisions that follows, the reader is advised that the contract between Blue Cross and the patient, has the indicia of an insurance policy that provides a series of listed services to the patient at no additional cost, if the patient uses a designated (or preferred) health provider such as Response. In other words, once deductibles and co-payments are met by the insured, the cost of the procedure is paid directly by Blue Cross to the preferred provider, and the patient is never billed. The contract between Blue Cross and Response is more like a business agreement where, for a pre-set figure, the provider will treat all patients sent to it by Blue Cross or other preferred providers. The provider bills Blue Cross, and is paid according to the contracted, scheduled amounts. Review of

the judgment is under the standard set forth in Rule 73.01 and *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976).

## THE JABBOUR–BLUE CROSS CONTRACT (managed care agreement)

In 1992, Jabbour took out an individual health policy, in which he was denominated as a "Non-group Alliance" member, with Blue Cross. Members such as Jabbour, were encouraged to use "participating providers," those who had a participating contract with Blue Cross in which the provider had agreed with Blue Cross on certain charges for certain procedures, and the member would "not have to pay participating providers any charges above the allowed charge." The contract provided coverage for HC treatment and covered "one hundred percent of eligible expenses," if administered through a managed care entity (a preferred provider). The term, "covered expenses" refers to charges for which Blue Cross "may make payment," and are "not necessarily the same as a Provider's actual charge, and the charges paid by Blue Cross shall be subject to the Schedule of Benefits...." "[Blue Cross] shall have sole discretion to determine Covered Expenses," subject to the contract terms, but "[i]n many cases, Covered Expenses are limited for the benefit of Participants [insureds], by the Provider's [Response] contract with [Blue Cross]." In instances where the insurance contract is silent as to terms for a procedure, Blue Cross is given "the sole discretion" as to the methodology to determine what is the "Usual, Customary and Reasonable Charge Maximums" (UCR). The UCR charge is determined by "comparing a provider's charge for a service to the 'usual' and 'customary' fees of providers with comparable qualifications."

The contract called for payment to be made directly from Blue Cross to a provider if it was a preferred provider (Response). If the provider was not a preferred provider, but was a participating provider not subject to an agreed upon schedule of charges, the provider would bill the member (patient) directly and the member would then seek reimbursement from Blue Cross. The con-

tract, with one exception, prohibited Jabbour from any assignment of benefits. The applicable exception read: "If Prescription Drugs are provided by a licensed pharmacist, [Blue Cross] will recognize a valid assignment by the Member [insured] to the pharmacist of the Member's right to receive payment for the Prescriptions Drugs ..." Prescription drugs are defined in the policy as "drugs and medicines ... which legally require a prescription by a physician ... and which must be dispensed by a licensed registered pharmacy...."

## THE RESPONSE–BLUE CROSS CONTRACT (preferred provider agreement)

Effective January 1, 1993, the parties to this suit entered into a "Participating Home Care Infusion Therapy Agreement," a contract form prepared by Blue Cross. Response is referred to as a "Home Care Infusion Care Therapy Provider (HC)," which seeks to provide, "HC services to covered persons." Several schedules regarding the amounts Blue Cross would pay for certain procedures were appended to the contract, but, only the "Infusion Therapy Prospective Payment Schedule Alliance Business" is applicable here. "Alliance business" is "[T]he name given to the preferred provider program offered by [Blue Cross] which provides incentives to Covered Persons enrolled in the program to utilize contracting preferred providers when health care is needed." (Jabbour was an Alliance member.) "HC services" are defined as: "HC infusion therapy procedures, care, supplies, and services rendered to a Covered Person by a Participating HC as ordered by the attending physician and included in the Plan of Treatment." As part of the two-page "Alliance Business" schedule, there is a portion for per diem fees for Chemotherapy in Infusion *Center* Cases.

Response agreed "... not to collect from Covered Person at the time of service ... and to accept [Blue Cross's] payment as payment in full." Blue Cross is required to pay Response the amount specified in the Prospective Payment Schedule, unless Response regularly charges less to other patients.

Early in Jabbour's treatment, and as forms were being submitted to Blue Cross by the IMPACT Center, it became apparent the provider contract did not cover the high dose treatment (HDC). The PSCT portion of the HDC was not mentioned at all in the contract and the regular HC provisions were inapplicable. Nevertheless, Response sent in bills, and over 20 payments were made by Blue Cross. Response continued to assert it was being underpaid by Blue Cross. Niether Jabbour nor his estate were ever charged or billed. Response performed all the necessary HDC, which called for chemo and prescriptive drugs. The IMPACT Center had a licensed pharmacist on staff, and its pharmacy was licensed by the state.

\* \* \*

The full sequence of events leading to this suit are now recounted. In November 1992, Jabbour's oncologist, also the medical director of the IMPACT Center, made a diagnosis of B–Cell lymphoma, prescribed the high dose of chemotherapy (HDC) supplemented with stem cell support (PSCT), and initiated Jabbour's treatment as an outpatient at the Response IMPACT Center in Columbia. The earlier mentioned stages of HDC treatment regimen call for chemotherapy, followed by harvesting of stem cells (healthy cells), then high doses of drugs to defeat the cancer, then infusion of the saved stem cells, and then a hospital admission.

It is necessary to make a distinction between HC and HDC. Generally, home infusion (HC) calls for a lesser treatment in a patient's home. The five-stage, heavy dose (HDC) treatment is primarily performed on an outpatient basis in a provider's facility. The difference is relevant in this case because the Response–Blue Cross contract refers only to preferred provider status for Response for HC. It is undisputed that Response has three facilities in the state. The facilities located in Kansas City and Saint Louis perform only the lesser treatment, HC. The Columbia facility that treated Jabbour, only administers the more extensive HDC treatment.

On November 30, 1992, Jabbour executed an assignment of insurance benefits from his

proposed treatment to Response. On December 3, 1992, shortly after Jabbour received preliminary treatment, Response sent a letter to Blue Cross requesting a determination of eligibility of benefits, and an authorization for Jabbour's treatment. Blue Cross responded by letter on December 21, 1992, stating HDC and PSCT treatment benefits *were available* and *eligible for coverage*. The first stage of HDC treatment began on January, 4, 1993. When the treatment was completed in March, the total charges were $66,338.00 and it is uncontested that this figure is within the definitional range of usual customary and regular charges in the community. Blue Cross paid $25,776.91, leaving a difference of $40,561.09.

* * *

Blue Cross's stated purpose for managed care contracts with insureds, and preferred provider agreements with providers, is to hold down health care costs and, therefore, reduce premiums to the public. The non-assignability provisions in the managed care contracts (except, as here, for prescription drugs) are necessary to thwart attempts by medical care providers to take assignments and collect amounts greater than those they agreed to in their Preferred Provider Agreements with Blue Cross.

This methodology is furthered by inducing the insured/patient to seek treatment from a preferred provider because there is little or no co-pay, and deductibles are more easily met. This results in little or no expense to the insured who is not even billed. If the patient chooses to use a non-preferred "participating provider," or a provider who has *no* contract at all with Blue Cross, the patient pays more, or even all of the expense, directly to the provider. Concomitantly, the non-contract provider would be paid more for services than it would have obtained based

on the schedule in the preferred provider contract, but the provider would have to bill and collect from the patient. Hence, it becomes obvious why it benefitted Response to argue the HC contract was not controlling. If there was no contract with Blue Cross, and if the patient's assignment was valid, it would enable Response to collect the full amount for services rendered.

* * *

Response filed a two-count petition seeking recovery of the difference between its charges and the reimbursement amount paid by Blue Cross. The judgment under review awarded Response the difference between its bill for the total charges and the amounts paid by Blue Cross ($40,561.09). This result is premised on these conclusions: 1) the preferred provider contract between Blue Cross and Response did not and does not apply to the HDC treatment and, therefore, the contract's schedule of payments had no bearing on the claim; and 2) the prescription drug assignment exception to the Blue Cross–Jabbour contract effectively allowed the assignment of the total Response bill from Jabbour to Response. Much of the confusion here is generated by use of a preferred provider agreement that did not fit the HDC treatment provided by Response Infusion Center in Columbia.

Using an HC contract to cover HDC treatment is analogous to the use of a street construction contract for a job requiring the building of a bridge. The explanation by Blue Cross was, "[T]his was the best fit of a contract, so it was expanded to include infusion center care." Despite the fact that the contract applied only to HC treatment, one of the attached schedules did partially itemize coverage for HDC treatment[1]. The language of the provider con-

---

1. *Infusion Center Cases*

| | | |
|---|---|---|
| 59610 | Chemotherapy (four or more hours to infuse) | $320.00* |
| 59560 | Hydration Therapy | $ 70.00 |
| 59640 | First dose Antibiotics | $ 90.00 |
| 59629 | Antineoplastic Agents at freestanding center | 90% of AWP |
| 53699 | Antibiotic/Antifungal/Antiviral/Antiretroviral Drugs at freestanding center | 90% of AWP |

* Item indicated with a per diem rate followed by an asterisk will be reimbursed at the per diem plus the AWP of the drug directly related to the therapy performed. AWP will *not* be provided

tract, and the language of the managed care agreement between Blue Cross and Jabbour are equally diffuse. The findings of fact and conclusions of law supporting the judgment are inconsistent. In an effort to simplify explanation of this decision, the court will rearrange and modify the issues presented and argued by the parties.

## I.

### What Could the Patient Assign to the Health Care Provider Under The Managed Care Contract?

■ Blue Cross asserts Jabbour had no power to assign rights under his contract. It cites numerous cases indicating the non-assignability portion of the insured's managed care contract is an essential ingredient to defining and limiting health care costs, for if the patient could assign his or her rights, it would totally undercut the pre-arranged costs with providers which are relied upon by Blue Cross in deciding the premium amount. See generally: *Obstetricians–Gynecologists, P.C. v. Blue Cross and Blue Shield,* 219 Neb. 199, 361 N.W.2d 550, 556 (1985); *Kent General Hospital, Inc. v. Blue Cross and Blue Shield,* 442 A.2d 1368, 1371–72 (Del.1982); *Augusta Medical Complex, Inc. v. Blue Cross,* 230 Kan. 361, 634 P.2d 1123, 1126–27 (1981); *Parrish v. Rocky Mountain Hospital & Medical Services Company,* 754 P.2d 1180, 1182 (Colo.App.1988).

Blue Cross prepared the contract with Jabbour. Despite provisions in the contract as to non-assignability, the exception language pointed out by Response allows a patient to assign the right to payment for prescription drugs. Blue Cross argues the prescription drug exception applies to a situation where the insured goes to a drug store, pays, and, then applies to be reimbursed by Blue Cross for the total amount less the insured's co-payment (here ten percent). The way the exception is written, it cannot be said it does not apply to the situation here, where prescription drugs were dispensed by a licensed pharmacist in a licensed pharmacy to the member-insured as

for drugs to control the side effects of the therapy. These drugs are included in the per diem

part of an ongoing and extensive five-stage process to cure a blood cancer. The court deems the language of the prescription drug exception ambiguous. Since it is subject to two different interpretations, the provision is construed against the insurer. *Zemelman v. Equity Mutual Insurance Company,* 935 S.W.2d 673, 675 (Mo.App.1996).

Under the managed care contract, the assignment from Jabbour to Response is effective and allows the provider ninety percent of its drug charges for Jabbour's treatment. The trial court's conclusion that Jabbour's drug assignment was effective as to *payment for the entire HDC treatment* was incorrect. The judgment also did not take into consideration the requirement that Jabbour pay ten percent of prescription drug costs.

At trial, the Blue Cross policy analyst was examined by Response's attorney, and testified as follows regarding the prescription drug exception:

Q. If we had a licensed pharmacist and they were licensed as a pharmacy, you would agree with me that this would be an exception to the nonassignability clause, wouldn't you?

A. I suppose for the prescription drugs, yes.

Q. And the prescription drugs are the chemotherapeutic drugs; is that right?

A. Yes.

The evidence at trial revealed Response was a licensed pharmacy and had a licensed pharmacist at the time of Jabbour's treatment. Therefore, by its own admission, Jabbour could assign his right to payment for prescription drugs.

This court cannot conduct a meaningful review of the prescription drug charge component of the total bill. On remand, the trial court is to make the proper determination, less co-payment and a credit for any payments for these drugs already made by Blue

payment. [AWP stands for average wholesale price.]

Cross.[2] *Rebound, Inc. v. Pugh,* 912 S.W.2d 660, 666 (Mo.App.1995).

## II.

### Does the Use of an Inapplicable Preferred Provider Contract Support a Conclusion the Parties Had No Contract?

■ The practical effect of the trial court's conclusion that the contract between Blue Cross and Response did not apply, is to put Response, after the fact, in the shoes of a non-preferred provider, a health provider with no Blue Cross contract, and more importantly, no agreed upon schedule of payments to limit its recovery. The problem with this conclusion is that the parties assumed the preferred provider contract was in effect. As such, Jabbour was entitled to treatment by a preferred provider, the provider was paid directly by Blue Cross (according to the contract schedule), Jabbour did not have to file claims nor make payments himself and then seek reimbursement from Blue Cross, and Jabbour was not billed, nor responsible, for any payment of his treatment.

Response and Blue Cross treated Jabbour as an alliance member who sought treatment from a preferred provider. It was only after Jabbour's treatment had begun that the parties discovered the contract between Blue Cross and Response's Columbia facility did not fully cover the sophisticated treatment of HDC. At no time was Jabbour billed by Response. If Jabbour had truly sought treatment from a non-preferred provider, he would have been billed, paid the provider, and then filed a claim with Blue Cross for reimbursement. In addition, Jabbour would not be fully reimbursed—he would have had a higher co-pay, a higher deductible, and would have to pay part of the bill himself. None of these events occurred. In light of the behavior of all parties here, Response cannot now be deemed a non-preferred provider for HDC scheduled services.

The schedule of payment contained in Response's preferred provider agreement had provisions for HDC chemotherapy and other delineated Infusion Center treatments. The parties had an agreement, and amounts were paid by Blue Cross to Response as a preferred provider under the schedule. The assignment obtained by Response from Jabbour was ineffective as to HDC costs. To the extent payments made by Blue Cross pertain solely to the HDC treatment (not drugs under I above, nor the unscheduled portions for PSCT under III below), the provider contract schedule will be enforced, and to the extent the judgment exceeds that total sum, it will be reversed. The HDC portion of the Response bill has been paid per the schedule in the contract, and need not be recomputed as part of the new total for the judgment.

## III

### The Estoppel Count and PSCT Payment

■ Response sought the same amount of damages through a separate count in its petition claiming estoppel. Response's evidence, as found by the trial court, was that Response administered the HDC treatment to Jabbour based on the specific representation by Blue Cross that the charges would be covered and benefits would be provided. The court ruled in favor of Response on this count but did not allow recovery since the entire amount prayed for was awarded under Count I for breach of contract.

To recap, Response wrote to Blue Cross on December 3rd requesting a determination of benefits and authorization of treatment for Blue Cross member, Jabbour. The letter outlined the PSCT component as well as the other stages of HDC treatment. The Blue Cross reply dated December 21, said: "Benefits are available for HDC and PSCT for the treatment ... the five phases proposed are eligible for coverage." But, for the portion of the schedule of payments for HDC in an Infusion Center (see Footnote 1), the preferred provider agreement between the parties was geared entirely to the less severe

**2.** This ruling takes into account the effect of the assignment of the Jabbour contract taking precedence over the preferred provider scheduled amount. The court is also cognizant that, under

the schedule, the provider is to be reimbursed at ninety percent of the average wholesale price of the drug, whereas Response's charges are 270% of its cost.

and less expensive treatment of Home Infusion Therapy (HC). The preferred provider agreement was silent as to PSCT, a vital component of Jabbour's treatment, and as to any agreed upon price for this sophisticated method of removing and, later, replacing the patient's healthy blood cells. As a general rule, PSCT is an integral part of HDC therapy. In the preferred provider contract between Blue Cross and Response, several aspects of HDC treatment are included in the schedule but PSCT is not included at all in the contract.

■ Blue Cross argues the elements of estoppel are not met and this theory does not support recovery. Blue Cross asserts none of its actions amounted to a promise to pay the total bill directly to Response. Promissory estoppel, is a form of equitable estoppel which arises from a representation made by a party which is reasonably relied upon by the other party who is injured. *Resnik v. Blue Cross and Blue Shield,* 912 S.W.2d 567, 572–73 (Mo.App.1995), quoting from *Peerless Supply Co. v. Industrial Plumbing and Heating Co.,* 460 S.W.2d 651, 666 (Mo.1970). Promissory estoppel has these specific elements: 1) promise, 2) on which a party relies to his detriment, 3) in a way the promisor expected or should have expected, and 4) resulting in an injustice which only enforcement of the promise could cure. *McCoy v. Spelman Memorial Hospital,* 845 S.W.2d 727, 730 (Mo.App.1993). Estoppel is not a favorite of the law and each element must clearly appear and be proven by the party seeking its enforcement. *Farmland Industries, Inc. v. Bittner,* 920 S.W.2d 581, 583 (Mo.App.1996). It is essential the promisor should have expected or reasonably foreseen the action which the promisee took in reliance on the promise. *Otten v. Otten,* 632 S.W.2d 45, 49 (Mo.App.1982).

This court considers the doctrine of promissory estoppel apt to meet the treatment provided by Response for PSCT. As to the rest of the HDC treatment, the agreement between Response and Blue Cross provided for a schedule of some HDC payments for alliance members such as Jabbour, even though the rest of the contract was couched in HC terms. As discussed earlier, the preferred provider contract, in cobbled fashion, did provide a schedule of some purely HDC component payments to be made from Blue Cross directly to the provider, and prohibited any assignment, other than, as addressed, for prescription drugs. Therefore, promissory estoppel does not cover the pure HDC treatment, but does apply to the PSCT component of HDC. The contract did not mention PSCT at all, and there is no schedule for PSCT payments. Jabbour was covered for HDC and PSCT under his managed care contract, but could only assign the drug portion of the total HDC procedure.

The treatment prescribed for Jabbour called for PSCT. The December, 21 letter from Blue Cross cannot be interpreted to mean only that Blue Cross was informing Response that Jabbour's policy covered Jabbour's five stage treatment—the inquiry from Response admittedly sought to insure it would be paid by Blue Cross for performing the treatment. The December, 21 letter promised Jabbour was covered for PSCT. Although the Blue Cross reply was not correct under the preferred provider agreement, it is inconsistent and inequitable to later allow Blue Cross to deny payment of PSCT. *Resnik,* 912 S.W.2d at 573. After the early stages of Jabbour's treatment had begun, Response made Blue Cross aware that its contract did not fully cover HDC. Negotiations ensued during Jabbour's three month treatment. This is not a factual situation where estoppel is defeated "... There is acquiescence by all concerned ... due to a common mistake." *Farmland Industries,* 920 S.W.2d at 583. Response could have reasonably expected to receive some payment for PSCT, based on the December, 21 letter from Blue Cross. The court rules the usual, reasonable and customary standard should apply to PSCT. On remand, PSCT treatment (Not drugs as covered in section I above) should be culled out from the total evidence of Response's charges of $66,338.00, and those charges, already found to be reasonable, customary and usual, should be added to the amount the trial court may award Response.

* * * * * *

The court makes the following two observations after attempting to wade through the facts of the case at bar: Blue Cross would be well advised to simplify and reduce to understandable English the contract language with members. In the same vein, Blue Cross and contract health providers should strive for brevity and simplicity in mutual agreements, and should take the time to tailor contracts to fit unique but predictable situations such as occurred here.

The judgment is reversed and the cause remanded for a hearing in conformity with this opinion, and in particular, 1) all prescription drugs forming a part of Response's charges are to be segregated, and Response is allowed ninety percent of its charges less any amount already specifically paid by Blue Cross to Response, and 2) all portions of the Response bill, except for prescription drugs, relating to PSCT treatment, shall be allowed to Response, less any amounts already paid, to the extent they have been found usual, reasonable and customary. The sum of 1) and 2), to the extent it exceeds the total amount paid by Blue Cross, $25,776.91, shall be the judgment allowed, plus interest.

All concur.