**DELMO, INC., Third–Party Plaintiff/Respondent,**

v.

**MAXIMA ELECTRICAL SALES, INC., Third Party Defendant/Appellant.**

No. 18775.

Missouri Court of Appeals, Southern District, Division One.

June 22, 1994.

---

**1.** References to statutes are to RSMo 1986.

John R. Hopkins, Jr., Poplar Bluff, for third-party defendant/appellant.

Karen J. Miller, Poplar Bluff, for third-party plaintiff/respondent.

SHRUM, Judge.

Delmo, Inc., brought a third-party claim against Maxima Electrical Sales, Inc., and obtained a money judgment. Maxima appeals; we affirm.

## FACTS

Delmo is an electrical equipment distributor; Maxima is a marketing representative for equipment manufacturing firms that do not have their own sales forces. In the transaction that spawned this lawsuit, Delmo requested a price from Maxima for five electrical transformers. Maxima obtained prices from Cooper Power Systems, a manufacturer of electrical equipment, and used those prices to formulate a response to Delmo. Using Maxima's price quotation, Delmo prepared a bid for its customer, JEM Development Corp., Inc., which, in turn, submitted a bid on a federal government project in Boulder, Colorado.

Sometime in November 1989, soon after JEM was awarded the government contract, it became apparent to Delmo and Maxima that Cooper Power's price for four of the five transformers was vastly understated for the type of transformer JEM needed, and, as a result, the prices quoted by Maxima and Delmo were much too low. When Delmo advised JEM that the price on four of the transformers would be significantly higher than originally quoted, JEM canceled its agreement to purchase the four from Delmo and obtained them from another source, spending a total of $33,485 more than the original price quoted by Delmo. Later, when Delmo sued JEM over an unpaid open account, JEM counterclaimed alleging it had been damaged by its reliance on Delmo's price quotation on the four transformers.

Delmo then filed a third-party claim against Maxima, seeking recovery for any sum it might have to pay on JEM's counterclaim. In its petition against Maxima, Delmo alleged, in part:

"5. ... Delmo requested a bid from Maxima for four (4) 225 KVA Network transformers and one (1) 225 KVA Pad Mount transformers [sic] to meet certain government specifications for use at the National Institute of Standards, Boulder, Colorado. Thereafter, Delmo also requested an alternate bid for 300 KVA transformers rather than the 225 KVA transformers.

"6. Maxima submitted a bid of $9,206.00 for each of the said 225 KVA transformers

and a bid of $9,943.00 each if the transformers were to be 300 KVA.

"7. At the time said bid was requested, Maxima was provided with government specifications and requirements for said transformers.

"8. Delmo relied on Maxima's quoted prices as set forth above in submitting its bid to the General Contractor, JEM, and Maxima knew or should have known that Delmo would so rely on its quoted prices.

"9. Subsequent to the submission of Delmo's bid to JEM, Maxima informed Delmo that it could not and would not supply the said transformers at the price previously quoted...."

Cooper Power was not a party to the lawsuit. At trial JEM confessed judgment for $12,000 on Delmo's account claim. After hearing evidence, the trial court entered a $33,485 judgment in favor of JEM on its counterclaim against Delmo and a judgment of like amount in favor of Delmo on its claim against Maxima. This appeal concerns only the judgment on Delmo's claim against Maxima, additional evidence of which follows.

JEM's president, John Dilks, testified he furnished Delmo with "a copy of the plans and specifications for this job and requested a quotation from them." Dilks identified Delmo's Exhibit 11 as the "drawings and specifications" for the Boulder project.[1] Although Dilks acknowledged that Exhibit 11 did not contain all the specifications for the project, he testified that Exhibit 11 described in detail the transformers required for the job and was sufficient for obtaining a price quotation.

Robert Hagemann, who handled the transaction for Delmo, testified his company had done business with Maxima previously. He said he telephoned Douglas McCullough, Maxima's president, and told him he needed a price on the transformers so he could provide JEM a bid for the Boulder project. Consistent with prior practice, Hagemann sent Maxima written descriptive material for the equipment. In this instance, Hagemann cut portions from pages 1 and 2 of the original of Exhibit 11 and "faxed" them to Maxima. Hagemann identified Delmo's Exhibit 1 as photocopies of the portions of Exhibit 11 that he excised and "faxed" to Maxima.

Exhibit 1 consists of four pages. Page 1 of Exhibit 1 contains what appears to be a drawing of an installed transformer; "General Notes" that state, in part, "New transformers shall be network transformers"; and the handwritten words (apparently added by Hagemann, although the record is unclear), "Room 2227" and "Floor plan and section are exact replicas for Room 3427."

Page 2 of Exhibit 1 consists of a photocopy of a drawing of Room 2227 and the following information:

"National Institute of Standards
& Technology

Boulder Laboratories, Boulder, Colorado

Building No. 1 (Radio Bldg.) Transformer
Replacement

Room 2227 (Wing 2)"

Page 3 of Exhibit 1 consists of "General Notes," one of which states "New transformer shall be pad-mounted," and what appears to be a side-view drawing of an installed transformer. Beneath the drawing is a handwritten notation (again, we assume, added by Hagemann), "Pit (South of Wing 5)."

Page 4 of Exhibit 1 appears to be an overhead view of the transformer described and illustrated on page 3. Included on page 4 is the following:

"National Institute of Standards
& Technology

Boulder Laboratories, Boulder, Colorado

Building No. 1 (Radio Bldg.) Transformer
Replacement

Pit (South of Wing 5)"

Hagemann identified Delmo's Exhibit 2, a three-page document, as Maxima's response

---

1. From the record, it appears Delmo's trial Exhibit 11 consisted of original, full size documents of unspecified dimension. As it appears in the legal file on appeal, Exhibit 11 consists of three pages of photocopies, reduced from original size to fit on standard 8½-inch by 11-inch paper.

to his request for a price quotation.[2] Dated August 17, 1989, page 1 of Exhibit 2 identifies its subject as "National Institute of Standards" and states:

| "Base Bid: | Three (3) Transformers, 225 KVA [3] (2 transformers located in building # 1, Room 2227, and 1 transformer located in Bldg. # 1, Wing 5—Pit Area) (transformer description sheets attached) | $24,626.00 |
| "Option [4] | Two (2) Transformers, 225 KVA (Located in Building 1, Room 3427) (transformer description sheet attached) | $18,412.00" |

In the margin of page 1 of Exhibit 2, immediately to the right of the "Base Bid" information, is this handwritten notation:

1—    9206.00
2—    9206.00
3—    6214.00

24,626.00"

Hagemann testified the marginal notation was his, that he took the "9206.00" from "this spec sheet that was sent to me from Maxima," and that the "6214.00" was from "the last page."

The "transformer description sheets" referred to on page 1 of Exhibit 2 and the "spec sheet" and "last page" about which Hagemann testified appear in the record as pages 2 and 3 of Exhibit 2. Each is a preprinted form. Page 2 (what Hagemann called the "spec sheet") is a Cooper Power Systems "RTE Small Power 3 [phase] Secondary Substation Transformer Field Pricing Guide." Handwritten portions of the form identify the "Salesperson" as "Doug McCullough," the "Job Name" as "National Institute of Standards," the "Customer" as "Delmo, Inc.," the "Quantity" as "2." In a "Notes" section at the bottom of the form is the handwritten entry, "Option 2 has 2 additional units same. > 4.9Z" Following the preprinted words "Net Price" is the handwritten entry, "9206.00." In separate sections of the form designated "Ratings," "Terminations," "Accessories," and "Arresters," several boxes are marked with handwritten "x's." Near the top of the form is the preprinted statement, "Note: If transformer cannot be completely described below, contact Small Power."

Page 3 of Exhibit 2 (the "last page," to use Hagemann's terminology) is titled "SPD 3 [phase] Padmount Transformer Pricing Guide." Directly beneath the title is the statement, "(If unit cannot be completely described by the features on the page, please contact SPD)." There are blank spaces for items such as "Customer Name," "Salesman," and "Job Name," none of which is completed. There are a few handwritten markings on the form. Because of the poor reproduction quality of the copies of the form in the legal file, the only legible handwritten entry, which is in the space designated "Quote Price $," is "6214.00."

Asked about the instructions on each form regarding transformers that cannot be "completely described," Hagemann said, "I don't contact RTE. I contact Doug."

Hagemann testified he relied on Maxima's prices to prepare his bid for JEM. He admitted he "didn't look too closely" at the two pages attached to Maxima's price quotation. He said he "assumed" Maxima's prices were

2. The three pages that constitute Delmo's Exhibit 2 also were introduced into evidence as a portion of Maxima's Exhibit Z. The exhibits were used interchangeably at trial. To avoid confusion, throughout this opinion we refer to the three-page Maxima response as Delmo's Exhibit 2.

3. As noted in its petition, Delmo subsequently requested a bid that reflected one change: an upgrade to 300 KVA capacity. From the record it appears the larger capacity applied only to the transformers for Rooms 2227 and 3427. As requested, Maxima revised its price to Delmo, and Delmo revised its price to JEM, but the price remained understated for network transformers. The change to 300 KVA and the price adjustment occurred prior to the discovery that the price was incorrect for the type of transformer JEM needed.

4. The federal government requested price quotations for the five transformers in the base bid/option form.

for four "network" transformers and one "padmount" transformer. Hagemann said he had "no idea" at that time what a "network" transformer was or what one should cost and that he had no reason to think Maxima's price was "way off base." Hagemann was asked if there was "anything on those attachments [the transformer description sheets] that would indicate to you that these were not network transformers or that they were not the transformers that were described in the plans or specs or whatever you want to call what you sent to Maxima?" Hagemann replied, "I would think not."

McCullough insisted that Delmo had sent Maxima insufficient information about the transformers. He testified that a former employee of Maxima, Eileen Hess, had handled the transaction for his company and that page 1 of Delmo's Exhibit 1 (the portion of Delmo's price quotation request that contained the "General Notes" that referred to "network transformers") "did not happen to be part of her file on this job." Asked what Delmo had sent, he replied, "Zero written specifications. Those three copies of a plan view, yes. Zero written specifications." He admitted, however, that if Maxima had received the General Notes that appear on page 1 of Exhibit 1, he could have determined the type of transformers for which a price was requested without what he referred to as "specifications."

McCullough was shown October 20, 1989, correspondence from Maxima to Delmo concerning substation transformers with a price each of $9,206.00 for 225 KVA and $9,943.00 for 300 KVA. In that correspondence Maxima's former employee Hess referred to a three-position switch "as requested on the General Notes supplied." Attached to the correspondence is another "substation transformer field pricing guide," this one indicating a 300 KVA capacity and a net price of $9,943.00. Of that October 20 correspondence with its reference to "General Notes supplied," McCullough said, "That's the first time I've noticed that."

Nevertheless, McCullough discounted the importance of the General Notes on page 1 of Exhibit 1 because, he said, Maxima "qualified very finitely what we had bid" by including the "transformer description sheets" in its response to Delmo's request for prices. McCullough portrayed the "transformer description sheets" as, in his words, "detailed descriptions showing that the one transformer design [page 2 of Exhibit 2] was a three-phase secondary unit[5] substation. The next page [page 3 of Exhibit 2] details out that this is a three-phase padmount transformer."

McCullough was asked the identify of the person who filled out the substation transformer field pricing guide (page 2 of Exhibit 2):

A: That page would have, from the looks of it, been made—that's a Cooper form and probably made in house at Maxima—

Q: And who—

A: —for price by Cooper, it looks like.

Q: And who would that have been sent to, you?

A: That would have been sent to the factory, and then they would have priced it and sent it back to us.

On direct examination, McCullough emphasized the statements on the preprinted forms that advised contacting the manufacturer if the transformer could not be completely described by completing the form. On cross-examination he admitted the statement was directed to Maxima, but added, "That's also directed to our customer. That's why we make it an attachment."

## STANDARD OF REVIEW

Our review is governed by Rule 73.01 and *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976). *Commercial Bank of Gideon v. Bien Co.*, 830 S.W.2d 503, 505 (Mo.App.1992). Thus, we will affirm the judgment of the trial court unless there is no evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law. Rule 73.01(c)(1); *Murphy v. Carron*, 536 S.W.2d at 32[1]. We give due regard to the opportunity of the trial court to judge the credibility of witnesses. Rule 73.01(c)(2).

---

**5.** Statements in McCullough's testimony and Maxima's brief notwithstanding, the word *unit* does not appear in the "title" of the form.

The trial judge as trier of fact may disbelieve testimony even if it is uncontradicted. *Johnson v. Gregg*, 807 S.W.2d 680, 685[3] (Mo. App.1991). When, as in this case, the trial court makes no specific findings of fact, we consider all fact issues to have been found in accordance with the result reached. Rule 73.01(a)(3); *Brown v. Mercantile Bank of Poplar Bluff*, 820 S.W.2d 327, 334[2] (Mo. App.1991).

## DISCUSSION AND DECISION

■ Missouri permits recovery by application of the doctrine widely referred to as "promissory estoppel." *See Townes v. Jerome L. Howe, Inc.*, 852 S.W.2d 359, 361 (Mo.App.1993); *Commercial Bank of Gideon*, 830 S.W.2d at 505; *Feinberg v. Pfeiffer Company*, 322 S.W.2d 163, 168 (Mo.App.1959); and a host of appellate court opinions that may be located by consulting 19 *West's Missouri Digest 2d* (1984) and 11A *Missouri Digest* (West 1952), "Estoppel" Key Number 85.[6]

Most Missouri cases rely, in whole or in part, on the Restatement of the Law of Contracts § 90 (1932), or the Restatement of the Law of Contracts (Second) § 90 (1979), or both, for a basic formulation of the doctrine. Section 90 of the 1932 Restatement provides:

"A promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise." [7]

The Restatement (Second) of Contracts § 90 provides in pertinent part:

"(1) A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. The remedy granted for breach may be limited as justice requires." [8]

■ Numerous Missouri appellate court opinions set out the "elements" that must be proven to invoke the doctrine of promissory estoppel. These opinions vary in degree of elaboration; however, all state there must be evidence to prove (1) a promise, (2) foreseeable reliance, (3) reliance, and (4) injustice absent enforcement.[9]

In its brief, Maxima makes two arguments that may be rejected summarily: there was no evidence of a "misleading or fraudulent

**6.** A thorough discussion of the development and application of the doctrine of promissory estoppel and its relationship to "traditional" contract principles, although not needed for disposition of this appeal, can be found at, for example, 4 Richard A. Lord, *Williston on Contracts* §§ 8:4–8:6 (4th ed. 1992); 1A Arthur Linton Corbin, *Corbin on Contracts* ch. 8 (1963 & Supp.1993); Benjamin F. Boyer, *Promissory Estoppel: Principle from Precedents* (Parts I & II), 50 Mich.L.Rev. 639 & 873 (1952); and Stanley D. Henderson, *Promissory Estoppel and Traditional Contract Doctrine*, 78 Yale L.J. 343 (1969).

**7.** The Missouri Supreme Court first acknowledged Restatement § 90 in *In re Jamison's Estate*, 202 S.W.2d 879, 886–87[13–14] (Mo.1947) (resolved on other grounds). In *Feinberg*, a Missouri appellate court for the first time permitted recovery under the doctrine of promissory estoppel as enunciated in § 90 of the Restatement. 322 S.W.2d at 168–69.

Missouri has a history of enforcing promises upon which the promisee justifiably relies that predates Restatement § 90's adoption by the American Law Institute in 1932, its recognition in *In re Jamison's Estate* in 1947, and its application by the *Feinberg* court in 1959. *See, e.g.,*

*Underwood Typewriter Co. v. Century Realty Co.,* 220 Mo. 522, 119 S.W. 400 (banc 1909) (adopting *Underwood Typewriter Co. v. Century Realty Co.,* 118 Mo.App. 197, 94 S.W. 787 (1906)); *School District of City of Kansas City v. Stocking,* 138 Mo. 672, 40 S.W. 656 (banc 1897); *Dodd v. St. Louis & Hannibal Ry. Co.,* 108 Mo. 581, 18 S.W. 1117 (1892); *Lawson v. Edwards,* 293 S.W. 794 (Mo.App.1927). In their Missouri Annotations to the Restatement of the Law of Contracts (A.L.I.1933), Professor Tyrrell Williams and Dean Alphonse George Eberle observe that the pre-Restatement Missouri cases are consistent with § 90 in result, although not in theoretical justification. Williams and Eberle at 42.

**8.** For a comparison of the 1932 and 1979 versions of § 90, see *Williston on Contracts, supra* note 6, § 8.5 at 84–117. Because the differences in the two versions do not affect our disposition of this appeal, we do not discuss them.

**9.** Although in its petition Delmo did not use the term "promissory estoppel," its factual allegations appear to invoke the doctrine, and at trial it presented evidence in support of those allegations. At no point in these proceedings has Maxima challenged the sufficiency of Delmo's peti-

statement" by Maxima, and there was no evidence of a "confidential or special relationship" between Delmo and Maxima that permitted Delmo "to rely on any offer other than the specific offer" made by Maxima.

■ Concerning the charge that there was no evidence of a "misleading or fraudulent statement" by Maxima, we note that fraud is not an element of promissory estoppel. *Footwear Unlimited, Inc. v. Katzenberg*, 683 S.W.2d 291, 296[8] (Mo.App.1984).[10] Regarding the second assertion, we recognize the possible relevance of evidence of a "confidential or special relationship" to certain aspects of the promissory estoppel doctrine such as the foreseeability by the promisor of the promisee's reliance, the reasonableness of the promisee's reliance, or the injustice that might occur absent enforcement of the promise. However, Maxima develops no such argument. Thus we deem the assertion abandoned. *See Hayes v. Hatfield*, 758 S.W.2d 470, 474[7] (Mo.App.1988).

■ In its brief and at oral argument, Maxima touches on one issue that is relevant to the doctrine of promissory estoppel and, thus, bears discussion. In effect, Maxima claims Delmo did not prove it was reasonable for it to rely on the $9,206.00 (and later, $9,943.00) price Maxima submitted as a price quotation for each network transformer because Maxima's response included the "RTE Small Power 3 [phase] Secondary Substation Transformer Field Pricing Guide" (page 2 of Exhibit 2). This is a legitimate complaint because a promisee seeking to enforce a promise under the doctrine of promissory estoppel must show that his or her reliance on the promise was reasonable. *See Otten v. Otten*, 632 S.W.2d 45, 49 (Mo.App.1982) (citing Henderson, 78 Yale L.J. at 346). *See*

*also* Restatement (Second) of Contracts § 90 cmt. b; *Laks v. Coast Fed. Sav. & Loan Ass'n*, 60 Cal.App.3d 885, 131 Cal.Rptr. 836, 840–41[2] (1976); *Atlanta Nat'l Real Estate Trust v. Tally*, 243 Ga. 247, 253 S.E.2d 692, 694[3] (1979); *Malaker Corp. Stockholders Protective Comm. v. First Jersey Nat'l Bank*, 163 N.J.Super. 463, 395 A.2d 222, 230[7] (1978), *certification denied*, 79 N.J. 488, 401 A.2d 243 (1979).

With the principles of Rule 73.01 in mind, we recount evidence that supports a determination that Delmo's reliance was reasonable.

Consistent with the companies' prior practice, Delmo sent and Maxima received documents (Delmo's Exhibit 1) that include "General Notes" stating that certain of the "New transformers shall be network transformers" and identify by number the two rooms in which network transformers were to be installed.

Maxima responded with documents (Delmo's Exhibit 2), page one of which states prices for two transformers for Room 2227 and two for Room 3427. Page 2 of Exhibit 2, the "substation transformer field pricing guide" that Hagemann referred to as the "spec sheet," states a price of $9,206.00 per transformer, an amount consistent with the "Base Bid" and "Option" price on page 1.[11] The October 20, 1989, correspondence confirms the $9,206.00 price (and advises of a $9,943.00 price for a 300 KVA transformer) for each transformer described in the General Notes, which calls for network transformers.

Hagemann testified his knowledge of network transformers and their prices was limited, that he relied on the prices stated in Exhibit 2, and that there was nothing about

tion to state a claim based on promissory estoppel; thus we do not rule on that issue.

In its respondent's brief, Delmo argued the applicability of the doctrine. In contrast, in its brief, Maxima treated Delmo's claim and recovery as having been founded on allegations of fraud or breach of contract. Maxima did not file a reply brief to counter Delmo's written promissory estoppel argument, and at oral argument Maxima did not directly challenge the applicability of promissory estoppel principles.

From our examination of the record, the arguments of the parties, and our independent review of the law, we have concluded the question before us is whether we should affirm the judgment

of the trial court based on the application of the doctrine of promissory estoppel.

10. *Compare Doe v. General American Life Ins. Co.*, 815 F.Supp. 1281, 1286[9] (E.D.Mo.1993), which incorrectly states that for the doctrine to apply the representation must be misleading.

11. At the risk of stating the obvious, we note that the "Base Bid" of $24,626.00 for Room 2227, as reflected by Hagemann's marginal calculations, is equal to two transformers at $9,206.00 plus $6,214.00 for a padmounted transformer. The option bid for Room 3427 is double the $9,206.00 price.

page 2 of Exhibit 2, the "substation transformer field pricing guide," that indicated to him that the prices were not for network transformers as described in the "General Notes" of page 1 of Exhibit 1.

Hagemann's testimony concerning the reasonableness of his reliance is supported by the exhibits themselves. Maxima's response in page 1 of Exhibit 2 was directly linked to pages 1 and 2 of Exhibit 1 by reference to the project name and the room numbers where the transformers were to be installed. Based on Hagemann's testimony and examination of those interconnected documents, we conclude it was reasonable for Hagemann to rely on the $9,206.00 price (later adjusted to $9,943.00) as being the price for each of the network transformers referred to in the "General Notes" on page 1 of Exhibit 1, unless there was something about page 2 of Exhibit 2, the "substation transformer field pricing guide," that made reliance unreasonable. The effect of page 2 of Exhibit 2 brings us back to Maxima's argument.

Reduced to its essence, Maxima's argument, here and at trial, is that page 2 of Delmo's Exhibit 2, the "substation transformer field pricing guide," with the word "substation" in its title and the various boxes marked with "x's," was sufficient to alert Delmo that Maxima was not bidding on network transformers for Rooms 2227 and 3427. However, in his testimony McCullough never explained in what way the information on the substation transformer field pricing guide should have alerted Delmo that the prices were not for network transformers. Maxima places great emphasis on the presence of the word "substation" in the title of the form that constituted page 2 of Exhibit 2. However, there is no evidence in the record to support Maxima's assertion at oral argument to the effect that "anyone in the business knows a substation transformer is not a network transformer." [12]

Maxima makes much of Hagemann's admission that he "didn't look too closely" at the document. However, we are not persuaded that a searching scrutiny of the substation transformer field pricing guide would have further enlightened Hagemann.

Maxima also relies on the portion of the substation transformer field pricing guide that advised contacting the manufacturer "If transformer cannot be completely described below . . . ." McCullough admitted the advice was directed to Maxima, and Hagemann testified, "I don't contact RTE. I contact Doug." A reasonable interpretation of the directive is that the person completing the form—in this case Maxima's employee—is the one to whom the admonition is directed.

Maxima's arguments challenging the reasonableness of Delmo's reliance have no merit.

We affirm the judgment of the trial court.

PARRISH, C.J., and MONTGOMERY, J., concur.

---

12. McCullough described his operation as "an engineering oriented business. We deal in very finite details, not 'what if's' or 'maybe.'" Asked to describe the difference between a "unit substation" transformer and a "network" transformer, McCullough said, "A unit substation transformer is a glob of melon and a network transformer is orange, so they're totally different animals." Although the mixed metaphor is humorous, it is also illustrative of the cursory nature of most of McCullough's testimony concerning the meaning of page 2 of Exhibit 2 and the reasonableness of Delmo's reliance.