**MIDWEST ENERGY, INC., Plaintiff/Appellant,**

v.

**ORION FOOD SYSTEMS, INC. and Ted Ries, Defendants/Respondents.**

**No. ED 75323.**

Missouri Court of Appeals,
Eastern District,
Division Five.

Jan. 25, 2000.

Motion for Rehearing and/or Transfer to Supreme Court Denied March 7, 2000.

Application for Transfer Denied April 25, 2000.

1. All further statutory references are to RSMo (1994), unless otherwise noted.

John L. Oliver, Cape Girardeau, for appellant.

Terry A. Bond, Leonard D. Vines, Clayton, for respondents.

CHARLES B. BLACKMAR, Sr. Judge.

The trial court granted summary judgment on all three counts of the plaintiff's petition and entered final judgment for both defendants. On this appeal we accept as true the facts appropriately established by the plaintiff in the manner prescribed by Rule 74.04 and afford the plaintiff all reasonable inferences from the facts adduced, disregarding defendants' contrary proffers except to the extent they are uncontradicted and unequivocal. *ITT Commercial Finance Corp. v. Mid–America Marine Supply Corp.*, 854 S.W.2d 371, 382 (Mo. banc 1993). We state the facts from the plaintiff's point of view, without any intimation that court or jury has to find any of these facts.

The plaintiff Midwest, a Missouri corporation, operates a chain of service station convenience stores in Southeast Missouri. The defendant Orion, a South Dakota corporation, has developed recipes and equipment for several fast food systems for which it issues franchises to local outlets. Defendant Ted Ries at material times was the district sales manager for Orion in the area in which Midwest has facilities.

In early 1996 Midwest undertook the construction of a substantial building in Fruitland, Missouri, designed for the operation of a service station and convenience store and estimated to cost $800,000. Its president and sole stockholder, Laura Younghouse, inquired into the possibility of a franchise for some of Orion's product lines. On March 27, 1996, Ries visited Younghouse and delivered to her an offering circular required by the Federal Trade Commission accompanied by a specimen franchise agreement in which the blank spaces were not filled in. The circular contained a caution about taking any further action until Midwest had been notified in writing that its application had been approved. Younghouse receipted for these documents and read them.

Ries advised Younghouse he had to check with other Orion franchisees in the area to determine whether they had any contractual protection from nearby competition. He checked particularly with Rhodes Oil, which had Orion franchises at several nearby locations. On April 13, 1996 Ries again visited with Younghouse, advising her that Rhodes and other franchisees interposed no obstacle and that "we can go forward with the franchise." Younghouse had already filled out and delivered a franchise application on behalf of Midwest for the new location. Midwest's building contractor was present at this conference and discussed the proposed construction with Ries and Younghouse.

During the next several months Orion provided drawings and specifications setting forth its requirements for the area in which its franchised products would be prepared and dispensed. Ries was in touch with both the general contractor and the electrician. He pointed out the need to enlarge the convenience store area to 800 square feet to meet Orion's special requirements. This was a larger area than Younghouse had originally planned. The final store layout and design was provided by Orion to Midwest on July 2, 1996.

Ries reported his contacts with Midwest to his immediate supervisor, Keith Watts, who told him to "go ahead" at the Midwest location. Orion prepared orders for the equipment necessary to prepare and serve the franchised products.

Under date of September 4, 1996 Midwest received from Orion an unsigned franchise agreement specifying an opening date of November 8, 1996. On September 13, Ries called to advise Younghouse he would call on September 18, 1996 to "pick up the franchise agreement."[1] He did not appear on that date and did not respond to Younghouse's persistent attempts to get in touch with him. There is evidence that his superiors instructed him to "make himself scarce" while they reevaluated the franchise situation.

On September 30, 1996 Younghouse executed the franchise agreement on behalf of Midwest and mailed it to Orion. In the meantime a representative of Rhodes, Midwest's potential competitor, had called Orion to report that he had seen a notice of Midwest's opening date of November 8 for the new facility and was not pleased at the thought of competition. Orion's executives decided not to issue the franchise to

Midwest, and one Schendel, an analyst, was instructed to write a letter to Midwest conveying this decision. For some reason the letter was not mailed until October 11, 1996. On October 1, however, Watts called Younghouse to advise her Orion was "withdrawing the franchise offer."[2]

The foregoing is an abbreviated summary of the bare facts that might be found. The record provided on summary judgment is voluminous, and other facts will be stated in the discussion of each of the several counts.

Midwest's petition declares in three counts as follows: (I) Breach of contract by Orion in failing to grant a franchise to Midwest; (II) Promissory estoppel against Orion in accordance with the provisions of Section 90 of the *Restatement (2d) of Contracts;* and (III) Fraud and deceit against Ries for willfully misstating the extent of his authority. We affirm the judgment on Count I, but find error in the entry of summary judgment on Counts II and III, and so remand this portion of the case for further proceedings.

### Count I – Breach of Contract

█ Count I declares on the five-year franchise agreement submitted to Midwest on September 4, 1996 as a contract between Midwest and Orion. The contract, however, is not signed by Orion. It cannot be performed within one year of its stated effective date of November 8, 1996. This contract is clearly unenforceable under section 432.010 RSMo 1994, known as the "Statute of Frauds,"[3] and nothing short of Orion's signature can make it into an enforceable contract. *See Mayer v. King Cola Mid–America, Inc.,* 660 S.W.2d 746, 749 (Mo.App.1983) and cases cited therein.

1. Younghouse testified that Ries said he would appear to sign the franchise agreement. For present purposes we disregard this statement because of questions about Ries's authority to sign not resolved by the cold record.

2. The record does not show whether Watts had received the franchise agreement signed

by Younghouse and returned by mail to Orion when he made this call, but, for want of Orion's signature, the time of receipt is not legally significant.

3. According to the writer's Contracts professor, the late Grover C. Grismore, the Statute of Frauds has furthered many more frauds than it has prevented.

■ Our cases clearly hold that a contract otherwise unenforceable because of the Statute of Frauds cannot be made into a fully enforceable contract through any doctrine of promissory estoppel. *Mayer,* 660 S.W.2d at 749; *Geisinger v. A & B Farms, Inc.,* 820 S.W.2d 96, 98–100 (Mo. App.1991) (recognizing that there might be some room for remedies based on promissory estoppel as discussed in the portion of this opinion dealing with Count II). Full enforcement of the contract would defeat the purpose of the Statute of Frauds.

Because the Statute of Frauds suffices to dispose of Count I, there is no need to consider the extensive discussion about which officers and agents of Orion had authority to sign franchise agreements. Wherever the authority lay, the agreement was never signed by Orion.

The parties clearly contemplated a written contract, and so neither was bound by the proposed franchise agreement until an authorized representative of each had affixed a signature.

There was no error in granting summary judgment on Count I.

### *Count II – Promissory Estoppel*

Count II seeks to state a claim under Section 90, *Restatement (2d) of Contracts* which reads in pertinent part as follows:

> Section 90. Promise Reasonably Inducing Action or Forbearance
>
> (1) A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. The remedy granted for breach may be limited as justice requires.
>
> . . .

Promissory estoppel has been part of the law of Missouri for many years, and our courts have cited Section 90 of both the First and Second Restatements of Contracts. *See In re Jamison's Estate,* 202 S.W.2d 879, 886 (Mo.1947). The doctrine is closely related to equitable estoppel, and there are statements in the cases that it is an equitable remedy. *Resnik v. Blue Cross and Blue Shield of Missouri,* 912 S.W.2d 567, 572–73 (Mo.App.1995); *Zipper v. Health Midwest,* 978 S.W.2d 398, 411 (Mo.App.1998). We have found no case, however, which rules the issue of availability of trial by jury in an action at law. There is language suggesting the doctrine should only be applied "in extreme cases to avoid unjust results." *Mayer,* 660 S.W.2d at 749. This is a standard somewhat difficult of application, and may influence the decision as to whether trial by jury is available. Inasmuch as the issue of trial by jury has not been briefed to us, we forego ruling the point pending further proceedings. We do observe that the question of whether the remedy is necessary seems inappropriate for decision on summary judgment, if the elements of promissory estoppel are arguably present.

Numerous cases, involving widely different fact situations, have considered the requirements for recovery under Section 90. In some the opinions seem overexpansive, seeking to lay down rules which are broader than required for the resolution of the immediate problem. We seek to apply the governing principle of the Restatement. We take note of several recent cases which have allowed recovery based on Section 90. *See Delmo, Inc. v. Maxima Elec. Sales, Inc.,* 878 S.W.2d 499 (Mo.App. 1994); *Response Oncology v. Blue Cross & Blue Shield,* 941 S.W.2d 771 (Mo.App. 1997). *See also Mahoney v. Delaware McDonald's Corp.,* 770 F.2d 123 (8th Cir. 1985); *Bower v. AT & T Technologies, Inc.,* 852 F.2d 361 (8th Cir.1988) (both applying Missouri law).

■ We have found no case discussing the method of jury instruction in Section 90 cases, and there are no MAI patterns. Nor do we find discussion of the appropriate form for findings of fact. There is some variation in the manner of stating

essential elements, but, as Judge Shrum observed in *Delmo,* all pertinent opinions list the elements as: (1) A promise; (2) foreseeability of reliance; (3) reliance; and (4) injustice absent enforcement. 878 S.W.2d at 504. For a more elaborate statement of essential elements, see *Resnik,* 912 S.W.2d at 572-3.

 The sense of the cases, and especially the recent cases, is that a plaintiff who can point to evidence which, if believed, would permit a judge or jury to find each of these elements, is entitled to go to trial without prior judicial determination as to whether the case is "extreme." All cases agree the essence of the plaintiff's case is justifiable reliance causing damage. Under Section 90 recoveries have been permitted which might not have been allowed under traditional contract doctrine.[4] We proceed therefore to determine whether Midwest has demonstrated that there is a genuine issue of fact as to each one of the essential elements as defined in the cases. If there is, then the motion for summary judgment on Count II was improvidently granted. If there is no genuine issue as to the existence of any one of these elements, then summary judgment is appropriate. We conclude that Midwest's proffer is sufficient to establish fact questions as to all four essential elements.

We consider initially the scope of the authority of Ted Ries. Orion has argued strenuously that Ries had no authority to bind Orion to any kind of an agreement, and that any action predicated on a promise by him must fail. Almost all of the argument, however, has been directed to the question of his authority to sign franchise agreements. From the statements in the record a jury could find that Ries had the duty of promoting new franchises for his employer's product and of working with prospective franchisees to do what was necessary in order to ready new franchises for opening.

In this connection Ries paid several visits to the Fruitland premises. He checked with other Orion-franchised locations in the vicinity and reported to Younghouse there was no conflict. He met with the general contractor and with the electrical contractor. Orion provided plans and drawings for the area in which the franchised products were proposed to be prepared, containing its requirements, and Ries discussed these with Younghouse. Orion's specifications required modification of the initial plans, and Midwest modified its plans accordingly, at some expense. Ries assisted Midwest in planning for an opening date of November 8, 1996.

Ries was the only representative of Orion who visited face-to-face with Younghouse. He made regular reports to his superiors in the company and consulted with specialists within the company on matters such as design and construction. The trier of fact could find that the management of Orion was well-informed about Ries's activities and that he had authority to do exactly what he did. It could also be found that, up to a point, Orion wanted an active franchise in Fruitland and wanted Ries to take the steps he did to make sure the franchise would be ready to operate by the November 8 date. We now consider whether the transactions between Ries, on behalf of Orion, are sufficient to provide a basis for the relief Midwest seeks.

### (1) Promise

The record shows several promissory statements made by Ries. On April 13, 1996, Ries called on Younghouse and told her he had received clearance from other franchisees and that "[we can] go forward with the franchise." He repeated his as-

---

4. *Prenger v. Baumhoer,* 939 S.W.2d 23, 27 (Mo.App.1997), discerns a "Missouri rule" in Section 90 cases to the effect that a promise must be contractually enforceable in order to meet the requirements of Section 90. That case involved a situation in which the parties each contemplated further bargaining, and is for that reason distinguishable from the cases cited in subsection (1) of this Section, in which the only problem relates to the Statute of Frauds.

surances that all was in order, providing floor plans, lists of required equipment, and, on July 2, 1996, a definitive layout. On September 4, 1996 Orion mailed to Younghouse a franchise agreement providing for an opening date of November 8, 1996. This document was not signed by anyone purporting to act on behalf of Orion, but Ries advised Younghouse he would appear on September 18 to pick up the franchise agreement. Younghouse understood that Ries proposed to sign on behalf of Orion. From the facts just stated the trier of fact could find Ries promised Midwest that a franchise conforming to the specimen provided to Midwest in March would be issued as soon as Midwest was ready to operate, and that Midwest could make preparations based on those assurances.

We have held the Statute of Frauds precludes recovery of damages for failure to grant Midwest a five-year franchise. This holding does not necessarily preclude an action on the theory of promissory estoppel. The last sentence of Section 90(1) provides "The remedy granted for breach may be limited as justice requires." Damages are measured by the reliance and should be limited to those naturally flowing from the reliance. *Mahoney v. Delaware McDonald's Corp.*, 770 F.2d 123 (8th Cir.1985). Thus, there are cases holding that partial relief may be accorded in cases in which the Statute of Frauds stands as a barrier to complete enforcement. *See Geisinger v. A & B Farms, Inc.*, 820 S.W.2d 96, 98–9 (Mo.App. 1991) (citing *Feinberg v. Pfeiffer Co.*, 322 S.W.2d 163, 168 (Mo.App.1959) and *Katz v. Danny Dare, Inc.*, 610 S.W.2d 121, 126 (Mo.App.1980)); *see also Chesus v. Watts*, 967 S.W.2d 97, 110 (Mo.App.1998). *Mahoney* points out the difference between the full contractual enforcement of a promise which cannot be performed within one year, and provision of a remedy for inducing reliance on a promise, limited by the extent of the reliance. *See* Section 90, *Restatement (2d) of Contracts*, Illustration

8. The promises shown by the proffers are sufficient to establish the first element of promissory estoppel.

#### (2) Foreseeable Reliance

The trier of fact could certainly find that, between April 13 and September 4, Orion and Midwest wanted to do business with each other. Ries was Orion's authorized liaison with Midwest in order to further preparation for undertaking the franchise. He had every reason to believe Midwest would hasten to comply with his directions, for fear that the tender of the franchise would be withdrawn. To the extent that his requests, on behalf of Orion, required expenditure or forbearance, he could confidently expect these would be forthcoming. Whatever authority Ries had with regard to executing franchise documents, he could surely forestall the granting of a franchise by expressing his disapproval.

#### (3) Reliance in Fact

The record shows, at the very least, that Midwest relied on Ries's promises by making changes in its plans for the fast food area and by forbearing attempts to interest other possible franchisors in its new facility. These, in and of themselves, are sufficient to demonstrate reliance and, when the reliance proved to be unjustified, damages. There may be other provable damages. There is no briefing of the issue, and argument did not focus on the quantitative scope of recovery. This trier of fact may be totally unimpressed with Midwest's evidence of damages, but enough has been shown to raise a factual issue.

Orion asserts emphatically that Midwest had no right to rely on anything Ries said as being binding on Orion. It is not necessary to show, however, that Ries had authority to determine that a franchise should be granted. As has been said earlier, it could be found that he had the authority to transmit Orion's instructions and requirements so as to assist Midwest

in putting itself in a position to commence operations under an Orion franchise. He could also confirm Orion's continued interest in Midwest as a franchisee and advise Midwest as to further necessary steps.

■ Orion also points to the cautionary language in the offering circular required by the Federal Trade Commission and in the specimen franchise agreement delivered with the circular on the occasion of Ries's first visit. These documents confirm the franchise agreement as the sole agreement between the parties, strongly suggest that Midwest avail itself of legal counsel in examining the documents, and expressly warn Midwest that it should not take any other action in anticipation of receiving the franchise unless and until it should have an executed franchise agreement in hand. The promises on which Midwest relies to invoke Section 90, however, came after these documents were delivered, at a time when Orion was encouraging Midwest to make active preparation to undertake the franchise. Under Section 90 Orion is not necessarily free to encourage reliance by promises made in the expectation of reliance, simply by reason of a prior written warning that its promises mean nothing until both parties have signed a franchise agreement. The situation is analogous to one in which a contract provides it may be modified only by an instrument in writing, but the parties later agree to an oral modification. *Fritts v. Cloud Oak Flooring Co.,* 478 S.W.2d 8 (Mo.App.1972). The examples to Section 90 show, moreover, that the plaintiff is not necessarily required to exercise perfect diligence.

Orion also argues that Younghouse, shown to be experienced in business, did not act reasonably in relying on oral promises. Whether her reliance was reasonable or not is a question of fact.

(4) Injustice Absent Enforcement

■ This element is not cast with precision. Numerous writings on Section 90 make it clear it is designed to protect the reliance interest. Damages are measured by the degree of reliance. When the other elements of a Section 90 claim are present, the "injustice" element is not appropriate for determination in a summary judgment proceeding. The parties will have to work with the trial court in determining the appropriate manner of submission.

We again caution that our somewhat detailed expostulation of the facts governing Count II represents only our conception of the permissible findings the trier of fact might make. We do not suggest in any respect that the fact-finder should make any particular finding, or that any particular conclusion is preferable. The record is voluminous, and we simply say we perceive genuine issues of material fact on each of the essential elements of an action under Section 90 sufficient to withstand a motion for summary judgment.

### Count III – Fraud and Deceit against Ries

Count III seeks actual and punitive damages on account of Ries's alleged misrepresentation of his authority to act for Orion regarding the grant of a franchise to Midwest. Since Count II is predicated on Ries's authority to do as he did, Count III is necessarily alternative to Count II. Our rules, however, permit alternative pleadings. Rule 55.10.

■ An action for fraud and deceit has numerous elements, repeated in the caselaw so often we need not state them further. *See Clark v. Olson,* 726 S.W.2d 718, 719 (Mo. banc 1987). There is also a tort of "negligent misrepresentation" with fewer and different elements. *Jim Lynch Cadillac, Inc. v. Nissan Motor Acceptance Corp.,* 896 S.W.2d 704, 707 (Mo.App.1995). A pleading based on fraud and deceit would ordinarily permit a submission on negligent misrepresentation. *See id.*

■ Inasmuch as Orion has spoken so strongly on the subject of Ries's lack of authority, we do not believe we should

deprive Midwest of the opportunity for an alternate submission, if Orion's position as to Ries's lack of authority prevails at the trial. All parties should understand that, if Midwest should recover on Count II, it would not be proper to enter an additional judgment on Count III.

The judgment for Orion on Count I is affirmed. The judgments on Counts II and III are reversed, and the case is remanded for appropriate proceedings consistent with this opinion.

MARY RHODES RUSSELL, C.J., concurs.

LAWRENCE G. CRAHAN, J., concurs in part and dissents in part in separate opinion.

LAWRENCE G. CRAHAN, Judge, concurring in part and dissenting in part.

I concur in the disposition of the breach of contract claim. I would affirm the judgment on the remaining counts as well.

As Orion correctly points out in its brief, Midwest's response to the motion for summary judgment did not comply with Rule 74.01. Midwest did admit or deny each of the material facts set forth in separate numbered paragraphs in Orion's motion but failed to "set out each additional material fact that remains in dispute" and failed to "support each factual statement asserted in the response with specific references to where each such fact appears in the pleadings, discovery or affidavits" as required by Rule 74.01(c)(2). Although Midwest did attach excerpts from various depositions, it did not state in its response what facts it contends these materials establish. Thus, the facts stated in Orion's motion and properly supported by affidavits and exhibits must be deemed admitted for the purpose of the motion for summary judgment. *Weiss v. Rojanasathit*, 975 S.W.2d 113, 120 (Mo.1998). Even considering the materials attached to Midwest's response, however, there is little, if any, dispute about the material facts.

Midwest's president and sole shareowner is Laura Younghouse ("Younghouse"), who has been in the service station business for 17 years. For the first 13 years she worked for Rose City Oil Company, which like Midwest operated service stations with convenience stores. In 1993, she went into the same business herself. By July of 1998, Midwest owned service station/convenience stores in seven towns in southeast Missouri.

In 1996, Younghouse, on behalf of Midwest, decided to build and operate a combination convenience store/service station in Fruitland, Missouri. Younghouse left a voice mail message for Orion's district sales manager Ries and he went to see her on March 27, 1996. Younghouse expressed interest in obtaining a franchise for three of Orion's franchised products which Midwest would offer in the Fruitland store: Hot Stuff Pizza, Smash Hit Subs and Cinnamon Street Bakery. During their meeting, Ries provided Younghouse with Orion's Uniform Franchise Offering Circular (UFOC), a document containing extensive disclosures required by federal law. 16 C.F.R. Sec. 436.1 *et seq.* Younghouse testified that, following the meeting, she did read this entire document. The UFOC provided to Younghouse at the meeting included the following very specific caveats:

To protect you, we've required your franchisor to give you this information.... Study it carefully.... Read all of your contract carefully. Buying a franchise is a complicated investment. Take your time to decide. If possible, show your contract and this information to an advisor like a lawyer or an accountant....

Federal Trade Commission

Washington, D.C. 20580

The UFOC further provided:

You should also refrain from taking any other action making any commitments in regard to an ORION franchise

until and unless you are notified in writing by ORION that your application for a franchise has been approved and that an ORION franchise has been issued in your name.

### CAUTION

ANY FACT, INFORMATION, PROMISE, ASSURANCE, REPRESENTATION OR CIRCUMSTANCE COMMUNICATED TO YOU THAT IS NOT CONTAINED IN THE ATTACHED AGREEMENT OR THIS OFFERING CIRCULAR IS UNAUTHORIZED BY ORION AND SHOULD NOT BE RELIED UPON BY YOU IN DECIDING WHETHER TO PURCHASE AN ORION FRANCHISE.

The UFOC also contained a specimen copy of Orion's standard franchise agreement, with none of the blank lines filled in. The specimen franchise agreement included the following provisions:

13.1 *Interpretation.* This Agreement, plus your application, are the entire and final agreement between you and us. You have not received or relied upon any representation, understanding, agreement or assurance not set forth herein and in our UFOC. . . .

13.2 *Governing Law* . . . This Agreement may be waived, modified or varied only by a writing signed by the parties. . . . No custom, practice or course of dealing constitutes a waiver of any provision of this Agreement. . . .

13.6 *Review.* You have reviewed this Agreement, our UFOC and other relevant information before entering into this Agreement with legal counsel or a professional business advisor of your choosing.

Younghouse admitted reading the UFOC in its entirety, including the express caution that she should refrain from taking any other action or making any commitments until notified in writing by Orion that the application for a franchise had been approved.

Following the March 27th meeting with Younghouse, Ries conferred with Paul Dirnberger of Rhodes Oil, one of Orion's largest franchisees in the area, and determined that the grant of a franchise to Midwest would not interfere with Rhodes' protected territories. Ries passed on the information he received from Dirnberger to Keith Watts, Orion's regional sales manager, who told him to go ahead and proceed with the Fruitland location for Midwest.

On April 13, 1996, Ries and Younghouse met again. Ries told Younghouse that the grant of a franchise to Midwest would not violate any contractual agreements between Orion and Rhodes Oil. At that point, Younghouse "gathered" that Ries must have authority to approve franchises because he had gone to Rhodes Oil himself and obtained "clearance." Younghouse also concluded that Ries had authority to approve the franchise because he told her at the April 13th meeting that "We can proceed with the franchise." According to Younghouse, she thought this created an oral contract for a franchise. Thereafter, Younghouse and Ries spoke on the telephone from time to time and Ries sent design layouts prepared by Orion for Midwest's use.

Ries and Younghouse met for a third time on August 26, 1996. Younghouse advised Ries that Midwest had decided not to carry the Cinnamon Street Bakery Products and to focus instead on pizza and subs. At this meeting, Ries again provided Younghouse with Orion's UFOC and standard franchise agreement.

On September 4, 1996, Midwest received from Orion an unsigned franchise agreement for Midwest to execute if it still wanted to become an Orion franchisee. The agreement specified an opening date for the franchise of November 8, 1996, which was the target date selected by Younghouse. Younghouse and Ries spoke by telephone on September 13, 1996. Ac-

cording to Younghouse, Ries told her he would stop by the proposed location so he and Younghouse could sign the franchise agreement.

During this time period, Midwest apparently began airing radio ads announcing the imminent opening of the Orion franchise at Midwest's new Fruitland store. An official of Rhodes Oil called William Langstan, one of Orion's district managers of operation, and expressed concern. Langstan passed this information to Orion's corporate headquarters. One of Orion's officers then told Ries that he should not go through with his planned meeting with Younghouse on September 18th because Orion was "evaluating the situation." Ries did not appear at Midwest's location on September 18th. On September 19th, Tom Kasper, Orion's vice president of sales, decided not to grant or enter into a franchise agreement with Midwest. At the time that decision was made, Orion had not received from Midwest a signed franchise agreement, a signed equipment quote, a final layout and design drawing, a certificate of insurance nor, so far as can be determined from the record, any money. In sum, Midwest had made none of the commitments that would be required of a franchisee.

On September 30, 1996, Younghouse, having heard nothing from Ries or Orion, executed the franchise agreement and mailed it to Orion. The next day, Keith Watts, Orion's regional sales manager, called Younghouse and told her Orion would not be granting Midwest a franchise. Orion confirmed this in a letter dated October 11, 1996.

After learning Orion would not grant a franchise, Midwest made arrangements to become a licensee of Pecadilly Pizza and Subs, using much the same concepts as would have been used with Orion. Midwest began offering Pecadilly products on January 7, 1997, selling similar pizza and sandwiches to those it would have offered if it had obtained an Orion franchise.

The recognized elements of promissory estoppel in Missouri are: (1) a promise, (2) on which the party relies to his detriment; (3) in a way the promisor expected or should have expected; and (4) resulting in injustice which only enforcement of the promise can cure. *Response Oncology, Inc. v. Blue Cross and Blue Shield of Missouri,* 941 S.W.2d 771, 778 (Mo.App. 1997). On the record before the court on summary judgment, there is no genuine issue of material fact that Midwest cannot establish any of these elements.

Ries' statement to Younghouse in April that "We can proceed with the franchise" was not a promise that a franchise has been or would be granted. It was a truthful statement of Orion's intent to work with Midwest to process its application, provide Midwest with the necessary information and, upon completion of that process, and assuming both parties were satisfied that the other was prepared to do what the franchise agreement would require it to do, to enter into a written franchise agreement. Although Younghouse claims to have interpreted Ries' statement to constitute an oral contract, such interpretation is unreasonable as a matter of law and inconsistent with her own actions. If Younghouse truly believed she had an oral contract in April, she would not have felt free to drop the Cinnamon Street Bakery products unilaterally in August. Younghouse does not claim that Ries ever told her she could dispense with a written agreement or any of the other requirements and still have a franchise.

The cases further establish that a party seeking to enforce a "promise" under the doctrine of promissory estoppel must show that his or her reliance was reasonable. *Delmo, Inc. v. Maxima Elec. Sales, Inc.,* 878 S.W.2d 499, 505 (Mo.App.1994)(citing *Otten v. Otten,* 632 S.W.2d 45, 49 (Mo.App. 1982)). As a matter of law, Younghouse's alleged reliance on Ries' alleged oral promise was unreasonable because she concedes that she was specifically apprised in writing, *twice,* that she should *refrain*

from taking any action or making any commitments until and unless she was notified in writing by Orion that the application for a franchise had been approved and an Orion franchise had been issued in her name. I can find nothing in Ries' conduct or statements that could conceivably be construed as waiving that requirement. To take action in reliance on Ries' oral statement of intent to proceed with the franchise, having been previously and repeatedly apprised of Orion's explicit admonition to refrain from such reliance is, as a matter of law, unreasonable.

Nor does the record reflect any actual reliance in the form of any material change of position by Midwest. Contrary to the suggestion by Midwest that it built a building 800 sq. ft. larger than it would have in anticipation of obtaining the franchise, Ms. Younghouse conceded that Midwest probably would not have constructed a smaller building if she had known she would not be awarded an Orion franchise. Indeed, the space that would have been used for the Orion products proved readily adaptable to a competitor's similar products. Although it is true that if Midwest had been apprised sooner that Orion wasn't going through with the deal it could have pursued other alternatives, this is true of any business relationship that remains unconsummated for whatever reason. Such failure to pursue alternatives cannot properly be characterized as "reliance" on the hoped for relationship; it is a well recognized risk of pursuing business opportunities that may not come to fruition.

Based on the very same language in the UFOC set forth above, Midwest likewise cannot establish that Orion should reasonably have expected reliance by Midwest prior to obtaining a signed agreement. Orion was entitled to assume that Midwest would heed its explicit and unambiguous warning. Even attributing Ries' knowledge to Orion, there was nothing to indi-

cate any material change in Midwest's position in reliance on any alleged promise of a franchise.

Finally, there is no evidence that there is any injustice to Midwest that can be avoided only by enforcement of the alleged promise.[1] Although they were to be featured, Orion's products would have been but a few of hundreds, if not thousands, offered at Midwest's convenience store. Having failed to obtain an Orion franchise, Midwest promptly obtained a substitute from a competing firm. Ironically, if Midwest had heeded Orion's admonition and not jumped the gun with its radio advertising, it very likely would have secured the Orion franchise it sought. Rhodes Oil had no contractual right to prevent a new franchise in Fruitland and but for Midwest's premature advertising probably wouldn't have voiced any objections before an agreement had been signed. All of the evidence before the trial court indicates that Orion had every intention of awarding Midwest a franchise if Rhodes Oil had not objected.

Application of the doctrine of promissory estoppel is to be used with caution, sparingly and only in extreme cases to avoid unjust results. *Meinhold v. Huang,* 687 S.W.2d 596, 599 (Mo.App.1985). This is not an extreme case. This is a garden variety business negotiation that didn't pan out, at least in part because Midwest disregarded Orion's explicit instructions not to do anything until the deal was consummated in writing. I find no injustice warranting application of the doctrine of promissory estoppel. If Midwest's claim is allowed, should Orion have a counterclaim for whatever it expended in drawing plans for the display of Cinnamon Street Bakery products? I would hope not, but the question illustrates the absence of mutuality that underscores the need to apply the doctrine sparingly.

1. The majority does not, in fact, enforce any identifiable promise to any degree. The fact that some as yet unspecified measure of damages must be substituted for enforcement of a "promise" is but a further indication why the doctrine is inapplicable.

It is also appropriate to note that the manner in which franchises are offered is heavily regulated. 16 C.F.R. Sec. 436.1 *et seq.* These rules require extensive disclosures that would have afforded Midwest ample protection if it had heeded the information provided. As required by the regulations, Midwest was provided with the names of Orion's officers, who could readily have cleared up any confusion Younghouse may have had about Ries' authority. If Midwest felt it necessary to materially change its position to accommodate the planned franchise, it could have insisted Orion expedite negotiation of a signed agreement. Midwest was specifically advised to consult with legal counsel but failed to do so. Given the substantial protections already enacted into law, it seems to me unreasonable to stretch a disfavored doctrine in an effort to protect those who ignore the many protections they already have. I would affirm summary judgment on the promissory estoppel count.

I would also affirm the judgment in favor of Ries on Midwest's fraudulent misrepresentation claim. All of the evidence provided to the trial court on summary judgment establishes that Ries' statement to Younghouse in April that "We can proceed with the franchise" was a truthful representation of Orion's present intent. Thus, it was not actionable. *See Trotter's Corp. v. Ringleader Restaurants, Inc.,* 929 S.W.2d 935, 940 (Mo.App.1996).

For the foregoing reasons, I would affirm the judgment in its entirety.